Everett H. BICKLEY and Mary B. Bickley, a Co-partnership, trading as Bickley Manufacturing Company, Plaintiffs,

v.

FRUTCHEY BEAN COMPANY, a Michigan Corporation, Lloyd DuBois and Wilmer Warner, Defendants.

No. 1759.

United States District Court
E. D. Michigan, N. D.
April 27, 1959.

Stanton & MacKenzie, Saginaw, Mich., for plaintiff.

Crane, Crane, Kessel & Deibel, Saginaw, Mich., Clarence B. Zewadski, Detroit, Mich., Learman, Learman & Mc Culloch, Saginaw, Mich., for defendant.

PICARD, District Judge.

### Findings of Fact

This is an action involving "trade secrets" in the manufacture and operation of a bean shorting machine.

Plaintiff partnership is one of the oldest, evidently best, and first, manufacturers of sorting machinery (bean, rice, peanut, coffee, lima, etc.) in the country. Defendant Company owns a bean elevator in Saginaw, Michigan and for twenty years rented bean sorting machinery from plaintiff. Defendant Lloyd DuBois was plaintiff's employee for thirteen years (1943–56) but since 1956 has been employed by defendant Company. De-

fendant Wilmer Warner has been an employee of defendant Company for about twenty years. He came to it when a boy and claims that his ambition throughout all those years was to make, some day, a really efficient bean sorting machine. Plaintiff Company rented its machines to defendant Company under contract and defendant DuBois frequently worked on those machines and experimented through, and with, plaintiff Bickley's improvements of sorting machines. Plaintiff had contracts with defendants' Company and DuBois, that they were not to take advantage of any trade secrets that either or both of them learned from plaintiff during these contractual relationships between them.

Present action was initially brought on both contract and common-law theories; the latter being a claim that defendant DuBois betrayed his trust in giving defendant Company, not only all confidential information, including all trade secrets on bean sorting machinery he had received while working for plaintiff Company, but had even helped defendant Warner (after he, defendant DuBois, became an employee of defendant Company) manufacture a bean sorting machine for defendant Company built along fundamentally the same lines as plaintiff's machine. We find that defendants' new machine is more the brain child of DuBois than of Warner who had worked years unsuccessfully trying to build a bean sorting machine until DuBois became an employee of defendant Company. Warner did, however, have a few ideas incorporated in defendants' machine.

While plaintiff's machine was built under patents, both expired and active, it is not claimed that defendants violated any patent rights of plaintiff. This action involves "trade secrets" solely, based entirely on the common law. Furthermore, any rights under contract originally claimed have been withdrawn by plaintiff, and the withdrawal accepted by the court and defendants.

When this action was first started and while plaintiff claimed that defendant Company had knowingly violated trade secrets received through defendant DuBois, plaintiff did not enumerate the alleged violated trade secrets, explaining that it could not do so unless and until it had an opportunity to inspect defendants' machines. But defendant Company insisted that if plaintiff inspected its machines plaintiff would undoubtedly, in retaliation, purloin some trade secrets that defendant Company had installed in its machine.

The court felt that during the preliminary stages of this litigation there was merit to both positions, so suggested that the parties agree upon an expert who would inspect defendants' machine after plaintiff had secretly enumerated to him just what trade secrets it claimed defendant Company was using.

This was done.

Professor J. D. Ryder, of Michigan State University, was selected and made an inspection of defendant Company's machine, it being agreed that his observations be made known to the court alone but if either side desired to examine or cross-examine said Professor, it would have the right to do so. Neither side now desires to interrogate Professor Ryder. It was further agreed that any information which the expert Professor might have concerning any and all bean sorting machines could be given to the court as an aid to him without advising either party of his conclusions.

Evidence was taken and plaintiff had the advantage of cross-examining all three defendants. Inter alia that testimony showed that defendant Company's machine is about ½ the size of plaintiff's, gets out about ½ the work and occupies about ½ the ground area; but this is compensated for because defendant Company has twice as many of its own machines as it originally rented from plaintiff.

The contract, of course, gave both plaintiff and defendant Company the right to terminate the agreement at any time and when this was done by defendant Company and defendant Company proceeded to build its own machines, this action was brought.

At the trial Professor Ryder sat with the Court and was frequently interrogated by the Court in whispers particularly as to the meaning of certain phrases and operations. Both sides contributed to the payment of the expert and the Court gave both parties complete opportunity to object to the presence of the expert and later to secure whatever information he might have given to this Court. And twice both sides have informed us that neither desires to examine Professor Ryder.

■ From initial proof it at first appeared that defendant DuBois had given the other defendants all, and only, information he had confidentially received as a result of his connection with plaintiff. Later, however, there was evidence that between the years 1943 and 1956 both DuBois and Warner were continually increasing their knowledge on bean separators from outside sources by reading books, magazines and viewing various other bean machinery throughout the country, etc. And we find that whatever knowledge others in the industry might have received either from patents which plaintiff Bickley controlled, or from general knowledge, was also available to defendants DuBois and Warner, and used by them when legally available, to construct the machine defendant Company now uses and for which it also has applied for letters patent. Plaintiff's cross-examination of defendants did not discredit the testimony on this phase of the case given by defendants and the burden to prove its case is, and was, on plaintiff —not on defendants. See L. M. Rabinowitz & Co. Inc. v. Dasher, Sup., 82 N.Y.S. 2d 431.

Furthermore, and this fact is also important, just before trial, plaintiff did reveal the alleged trade secrets (twelve) which it claims defendant Company "stole" from it through defendant Du-Bois well knowing that these were trade secrets of plaintiff.

Those alleged "trade secrets" are as follows:

"(1) *Agitate* the mass of beans so that they will flow uniformly from the bottom of a bin, hopper or tube.

"(2) *Collect and arrange* the beans into single file on a suitable carrier.

"(3) *Jostle or vibrate* the beans on the carrier in a definite manner or sequence to produce individual center of gravity and axial orientation of the moving beans.

"(4) *Expose the tops* of the moving line of beans at the end of the carrier to *focused light* of controlled constant intensity and characteristic.

"(5) *Collect and sort* the reflected light pulses as they come from each bean in such a way as to accept certain of the color light components, and reject the specular *glare* light components.

"(6) Change the color light component pulses into phased electrical pulses, thus producing a series of controlled electrical pulses in synchronism with selected color of the individual moving beans passing the scanning point.

"(7) Multiply or amplify the synchronized electrical pulses until such pulses are strong enough to generate a substantial synchronous pulsating magnetic field and *reject all pulses* below a definite fixed amount.

"(8) Collect the synchronous pulsating magnetic field and concentrate it at one point.

"(9) Provide, at this point of concentration, a movable mechanical part to change the pulsating magnetic field to synchronous pulsating mechanical movement.

"(10) Provide a suitable device to change this pulsating mechanical movement into a phased air stream.

"(11) Direct the synchronous phased air stream at the moving orientated beans, allowing for time lag occasioned by these steps so that each bean will be hit with a small

volume of fast moving *low pressure air* to cause separation of the beans according to the selected color reflective properties of each bean.

"(12) Collect the now separated classified groups of beans together in suitable receptacles or containers for any further desired disposition."

Plaintiff now asks money damages from all defendants plus injunction to prevent them, and particularly defendant Company, using the machines which defendant Company has and which plaintiff claims are in truth practically duplications of plaintiff's machine on a smaller scale.

The amount involved is considerable because an injunction would probably put defendant Company out of business, at least temporarily.

### Conclusions of Law

The parties are agreed on most of the law, but since defendants claim that either—

(a) plaintiff surrendered its rights to recovery here because of several Letters Patent issued to it (or Bickley personally) disclosing all twelve alleged "trade secrets", or

(b) those not disclosed by Letters Patent are not "trade secrets" but were within knowledge of the general public.

We must first determine

### "What Is A Trade Secret?"

■ There are several definitions but we accept that given in Restatement of Torts, Vol. 4, Sec. 757, usually adopted in cases cited:

"A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. * * * The subject matter of a trade secret must be secret."

■ Then, second,

### "What Is The Effect Of Disclosure Made In a Patent?"

and here we believe the law to be as stated in Sandlin v. Johnson, 8 Cir., 1944, 141 F.2d 660, 661 as follows—

"If a discovery is one which constitutes invention and for which a patent is issued, the right of further secrecy is, of course, lost, for a legal disclosure and public dedication have then been made, with a right of limited and temporary monopoly granted as the reward."

Also Newport Industries, Inc. v. Crosby Naval Stores, Inc., 5 Cir., 139 F.2d 611, puts it thus on p. 612—

"A process that is a secret cannot be one that is patented; because full disclosure, so that the public may know how to use it when the patent expires, is the consideration for the monopoly given the patentee for a limited time."

And the Michigan Supreme Court phrased the answer as follows in Dow Chemical Co. v. American Bromine Co., 210 Mich. 262, at page 288, 177 N.W. 996, at page 1005:

"An inventor, desiring to secure to himself the fruits of his invention, has two courses open to him: First, to patent the same, thus securing an *absolute monopoly* for a limited time; or, second, to keep his invention a secret, by which means he gets an *imperfect monopoly* for an indefinite period." (Emphasis ours.)

See also Conmar Products Corp. v. Universal Slide Fastener Co., 2 Cir., 172 F.2d 150; and Goldin v. R. J. Reynolds Tobacco Co., D.C., 22 F.Supp. 61.

Third,

### "Is It Necessary That It Be Proven That The Person Making The Disclosure Know Of The Patent Provisions?"

We hold, no. As stated in Conmar Products Corp. v. Universal Slide Fastener Co., supra, 172 F.2d at page 155—

"Since the specifications of the patents in suit disclosed the first six secrets and part of the seventh, that

much of the secrets upon issue of the patents fell *into the public demesne;* and, prima facie, the defendants were free to use them." (Emphasis ours.)

In National Starch Products v. Polymer Industries, 273 App.Div. 732, 79 N.Y.S.2d 357, 360, the court said—

"* * * if there has been a *voluntary disclosure by plaintiff, or* if the *facts* pertaining to the matter are a subject of *general knowledge in the trade, then any property right has evaporated.*" (Emphasis ours.)

And here is Sandlin v. Johnson, supra, mis-quoted by plaintiff but which reads—

"The fact, however, that another has legitimately discovered the trade secret will not permit one to whom a confidential disclosure has been made to violate the confidence, where the matter has not been generally disclosed by any of the discoverers, so as to have become public knowledge and property."

Since in the case at bar it is admitted that having been a member of plaintiff's employee group for thirteen years Du-Bois must have knowledge of what the patents show.

Finally, we recognize that a "trade secret" does not necessarily have to be patentable.

Mycalex Corporation of America v. Pemco Corporation, 64 F.Supp. 420, states at page 423—

"It will be seen that the law gives to the owner of a trade secret protection which is in *some respects greater* and in *some respects less,* than that afforded by the patent law. That is to say, the protection is greater than that afforded by patents in that it is not limited to a fixed number of years, and does not require novelty and invention as in the case of patents." (Emphasis ours.)

And Fairchild Engine & Airplane Corp. v. Cox, Sup., 50 N.Y.S.2d 643, 656, quotes from Restatement of the Law of Torts, pages 6 and 7:

" 'Novelty and prior art. A trade secret may be a device or process which is patentable; but it need not be that. It may be a device or process which is clearly anticipated in the prior art or one which is merely a mechanical improvement that a good mechanic can make. Novelty and invention are not requisite for a trade secret as they are for patentability. * * * The protection is merely against breach of faith and reprehensible means of learning another's secret. For this limited protection it is not appropriate to require also the kind of novelty and invention which is a requisite of patentability.' "

Also see A. O. Smith Corporation v. Petroleum Iron Works Co., 6 Cir., 73 F.2d 531; and Schreyer v. Casco Products Corp., 2 Cir., 190 F.2d 921; and Russell v. Wall Wire Products Company, 346 Mich. 581, 78 N.W.2d 149, 154.

We proceed and state that while there is no contract upon which action is now based the parties agree that ordinarily defendant DuBois had no right to disclose to anybody any "trade secrets" which he might have received exclusively and confidentially while in the employ of plaintiff. And they agree that whether defendants, Warner and Company, knew or did not know DuBois was doing this, defendants should be enjoined from further use of their machine and would be liable in damages to plaintiff.

The parties are also agreed that if plaintiff by its patents gave certain information to the public such information was available to anybody—except—plaintiff maintains, that if defendant DuBois received all his information exclusively through his confidential association with plaintiff he would not be permitted to disclose that confidential information to either defendant Company or Warner without liability on the part of all three defendants, even if the whole outside world knew these trade secrets through patent discoveries or otherwise. Defendants deny that this is the law and we agree with defendants.

But regardless of the law, we find that DuBois and Warner also received the information DuBois supposedly got confidentially of plaintiff but from other sources and that they also got other and further information from other sources and used it. And this fact is really the crux of the matter since defendants claim that what is in the public domain is in the public domain for everybody; that all information contained in the patents are in the public domain and, as we have found, and do hold that whatever information used by defendants not contained in the patents themselves, were not "trade secrets" but information that defendants DuBois and Warner got through books and in other ways such as inspecting other machines—and this was information available to the world.

There is no evidence introduced to show that this claim of defendants was an afterthought. As in Ackermans v. General Motors Corporation, 4 Cir., 202 F.2d 642, no serious attempt was made to discredit either defendant DuBois or Warner. In fact defendants' counsel did not pursue his cross-examination of defendants after plaintiff had concluded his cross-examination, as he had a right to do, but stated he would call them (defendants) in his "direct case". And it was in his "direct case" that this claim of knowledge was produced leaving the court convinced that defendants DuBois and Warner must have received more information in constructing their bean sorting machine from books, magazines and inspecting constructions of other machines, than defendant DuBois got alone as an employee of plaintiff Company.

In their brief defendants advanced five reasons for judgment in their favor.

First, that the agreement on which suit was brought was a "contract in restraint of trade" charging plaintiff with "unclean hands". But we hold that this present suit is not on the contract. So while there may have been merit to defendants' position we reject the "unclean hands" theory. The contract on which that theory is based, *is out*.

Defendants' second point is that plaintiff failed to disclose its "trade secrets" that were used by defendants. But we also reject this because plaintiff did, just before trial by permission of the court, make such a disclosure.

So we pass to the other three which involve the merits of the twelve points advanced by plaintiff and without specifically repeating those "trade secrets" we hold:

Trade Secrets Numbers 1, 2, 3, 7, 8, 11 and 12 are all disclosed by Bickley's Pat. 1,921,863, issued in 1933 and expiring in 1950. In addition Number 7 is revealed by Bickley's 2,665,388, and by Logan's Patent of 1923.

Number 4 is revealed by Bickley's Patent 2,580,275 (1951).

As to number one, electric vibrators such as "Syntron" were not available in 1933 but now they are usual in handling any forms of granular or particulate material.

As to Number two, the rubber belt claimed as a plaintiff trade secret was first seen by defendants DuBois and Warner in an Owosso plant and is also discussed in Caldwell Patent 2,595,762 (1952). It replaces Bickley's spring belt and while it may not be as good as Bickley's it seems to do the work. However, the use of belts in carrying objects in single file is covered in many other patents and is common in the industry. Defendants' rubber belt seems to be an improvement in durability over Bickley's machine, since Dr. Ryder reports that when he inspected the Bickley machine he found there were several breaks in the spring belts awaiting repair.

Further as to three, we add that Bickley does have a secret design of the guides but this does not seem to be necessary and the defendant Frutchey machine does not align beans as carefully or produce center of gravity orientations as claimed by Bickley.

As to four, besides the patent disclosure we add that in the defendant Frutchey lenses only about 25 per cent of the lamp output is aimed on the bean.

As a matter of fact, a book—Industrial Electronics Reference Book for engineers by the Westinghouse Electric Corporation, allegedly read by DuBois and Warner, was published by John Wiley & Sons in 1948. At the top of page 633 of that book it says—

"Applications dealing with small objects or small displacements, or requiring a small, high-intensity spot of light generally require concentrated light sources. Such a source usually consists of a low-voltage lamp placed outside the focal point of a convex lens to produce a converging beam."

It appears that "focused light systems" similar to the one used by defendant Frutchey are a part of every sound moving picture projector and defendant Frutchey certainly did not copy Bickley's complex and refined optical system. In fact, the Frutchey system is almost an exact copy from Hanson's Patent No. 1,973,206 (1934).

Number six—any traffic counter or electric door opener does the same thing, differing only in speed of operation. Logan's Patent in 1923 was for a counting system.

Number seven has been common in the art ever since 1923 (Logan). While here both devices utilize the same basic electronic circuit, this is so because it is the simplest manner in which the job can be done. The basic circuit under discussion appears in Bickley's patents 2,665,388 (1954) and No. 1,921,863 which states—

"any well-known photo-electric circuit can be used, such, for example, as shown in Fig. 6."

The circuit used is certainly in the public domain.

Number eight referring to the coil of the Bickley puffer or the coil of the relay of the defendant Frutchey ejector, appears in both Bickley patents cited above. But such relays or coils are used in every electronic counter, door opener, or other light operated device and the telephone companies employ relays for the explicit function of that trade secret by the millions. In fact many door openers are pneumatic, or use air to operate and thus the relay used then performs the same identical function as Mr. Bickley's puffer, namely to release some air. This puffer was also disclosed in the Bickley patent 2,615,470 (1952). The defendant Frutchey ejector operates in a different manner.

Number eleven is disclosed in Bickley's patent 1,921,863, where in claim 11 it says—

"* * * transverse air jet adapted to impinge on objects located at or near said point on said carrier, and photoelectric means adapted to control the action of said air jet for the purpose described."

Number twelve is covered above.

Number five is not as refined in the defendant Frutchey design as that of Bickley. It (Frutchey's) does not appear to avoid specular glare yet the machine seems to work. Dr. Ryder adds, that plaintiff Bickley seems to over-estimate the importance of "avoiding specular glare."

Number ten is not used in the defendant Frutchey machine and may or may not be considered a major improvement over Bickley since the air is always moving through the Frutchey ejector; only its direction is changed.

Number nine of Bickley's claim is very indefinite and is governed by Detachable Bit Company v. Timken Roller Bearing Company, 133 F.2d 632, 635, a case decided in our Sixth Circuit. There the court said—

"There is assertion but no proof of secret processes. Neither in brief nor oral argument was counsel able to indicate, even in a most general way, the trade secrets or processes that were obtained or appropriated."

Incidentally, Bickley didn't know how the defendant Frutchey ejector operated until it was brought out in court. In fact his first reply indicated that he didn't think it would operate without turning the air on and off. His claim, therefore,

524

was too vague and is not in our opinion a trade secret if for this reason alone.

 While we feel that defendant Du-Bois did take full advantage of his former position with plaintiff we find that everything that he used was already disclosed by patents or were not trade secrets at all. See American Potato Dryers v. Peters, 4 Cir., 184 F.2d 165.

 Plaintiff seems to believe that because of his former association with plaintiff, DuBois was forever precluded from getting a job with a bean sorting company. That is not our understanding of the law. We hold that DuBois was within his legal rights to use his skill, experience and general knowledge, but not trade secrets, to assist anybody—competitor of Bickley's or not. See Official Aviation Guide Co. v. American Aviation Associates, 7 Cir., 150 F.2d 173, 178, where the court says—

"* * * an employer cannot prevent his employee from using the skill and intelligence acquired through experience received in the course of the employment."

Several cases hold the same. Fairchild Engine & Airplane Corp. v. Cox, Sup., 50 N.Y.S.2d 643, quoting from an opinion of Judge Taft—Cincinnati Bell Foundry Co. v. Dodds, 19 Wkly.Law Bul., (Ohio) 84, states:

"'* * * It would be a violation of every right of an employé of a manufacturer to prevent the former from using, in a business of his own, knowledge which he acquired in the employ of the latter when he might have acquired such knowledge in the employ of other manufacturers. Indeed, a contract not to do so would probably fail of enforcement because in restraint of trade.'"

Defendants insist that all DuBois did was to use his general knowledge, together with knowledge legally available to the public, to assist in making the defendant Frutchey bean sorting machine and according to the above citations he had that right.

 And so we hold for defendants for the further reason that we believe the case at bar seems simply an attempt by Bickley to protect his bean sorting machine after expiration of his 1933 patents, which is contrary to not only the reasoning back of the Patent Law but is certainly not the intent of Congress or the common law.