SIMPLEX WIRE & CABLE CO.,
Plaintiff,

v.

DULON, INC., and Han M. Wong et al.,
Defendants.

No. 61-C-2.

United States District Court
E. D. New York.

July 10, 1961.

Buell, Clifton & Turner, New York City, for plaintiff, by Richard Swan Buell, New York City, of counsel, for the motion.

Richard I. Donner, New York City, for defendants.

RAYFIEL, District Judge.

The plaintiff is a Massachusetts corporation and maintains its principal place of business in Cambridge, in that State. The defendant Dulon, Inc., hereinafter referred to as Dulon, is a Delaware corporation and maintains its principal office in this District. The defendants Wong, Lockridge, Pensa and Pollak are citizens of the State of New York. The remaining defendants, Wilkins, Jones and Chan, have not been served with process herein, and the complaint has been dismissed as to them.

This is an action for a permanent injunction, and the plaintiff has moved for an order enjoining the defendants, *pendente lite,* from using or disclosing secret processes, formulae, data, information or knowledge alleged to have been obtained or acquired by them as hereinafter stated, or from making or selling products utilizing the same. The defendants stipulated to the entry of a temporary restraining order to be ef-

fective until the determination of this application.

The hearing on the application for a preliminary injunction commenced on February 9, 1961, continued on February 16, 17 and 20, and was concluded on February 21. Considerable oral and documentary evidence was introduced, from which it appears, inter alia, that for various periods the individual defendants were in the employ of Hi Temp Wires, Inc., a New York corporation, hereinafter referred to as Hi Temp. Each of said defendants, except Jones, upon entering such employ, signed an agreement which, so far as is here pertinent, provided, in substance, that he would not, during such employment or thereafter, disclose or authorize others to disclose any trade secrets, manufacturing processes, formulae, or any other confidential information or knowledge relating to Hi Temp's business which he may have acquired through or by reason of such employment.

In September, 1960 Hi Temp was merged into the plaintiff and thereafter its business was, and still is, conducted as a division of the plaintiff under the name Hi Temp Wires Co. It is engaged, as it was prior to the said merger and during the course of its employment of said defendants, in the manufacture and sale of products made wholly or in part from polytetrafluroethylene, a chemical commonly known under its trade name, Teflon, and various other articles used in the treatment thereof. Included among its items was the insulation of wire by various processes employing Teflon tape which it purchased from then available commercial sources, none of which processes, it concedes, is secret. Thereafter it began to use machinery designed to extrude Teflon onto wire. The machinery thus used, it likewise concedes, is not a trade secret.

It contends, however, that certain devices, consisting of so-called tips, dies and ovens, which it designed and uses to facilitate production, *are* trade secrets.

In or about mid-1958 Hi Temp began to make its own tape, using part of its pro-

duction to meet its own manufacturing requirements, and selling the remainder to the trade. The insulation process then employed by Hi Temp was to spirally wrap the wire with the tape which it manufactured for that purpose.

Wire, insulated by the use of Teflon, whether by the extrusion process or when wrapped with tape, has a slippery surface, and resists adhesion by other materials. Various techniques have been developed and are now in use which so change the surface characteristics of Teflon-insulated wire as to permit other materials to adhere to it, or, as the trade has it, to make it "bondable" with such materials. These methods are well known in the industry. The plaintiff claims, however, that Hi Temp has developed, and uses, certain secret processes to accomplish that purpose.

Further, the plaintiff claims that it has developed certain inks which, unlike ordinary inks, can effectively mark and identify various types of Teflon-insulated wire. It concedes that there are other inks in use for that purpose, but it maintains that its product is different and more efficient than the others.

And, finally, it claims that over the years it has acquired a considerable body of knowledge concerning the requirements and buying habits of those who use its products, and that that knowledge is confidential and a trade secret.

In brief, it is the plaintiff's contention (1) that on various dates the several individual defendants entered the employ of Hi Temp, each of them, except Jones, executing a nondisclosure agreement, (2) that during the course of and incidental to such employment confidential knowledge and information respecting those of the aforementioned methods, processes, etc. claimed to be trade secrets was divulged to or acquired by them, and (3) that in violation of the said nondisclosure agreement the said defendants, while still in the employ of Hi Temp and the plaintiff, conspired to and did appropriate and use said trade secrets in competition with the plaintiff.

These are the claimed trade secrets alleged to have been appropriated and used by the defendants:

(a) the dip coating process for insulating wire with Teflon,

(b) procedure for extruding Teflon onto wire,

(c) a process for manufacturing Teflon tape,

(d) a process for making Teflon-insulated wires "bondable",

(e) formulae for inks used for marking or striping Teflon-insulated wires, and

(f) certain sales information respecting the standards and specifications required by its customers and the identity of the buyers who purchase plaintiff's products.

*As to (a):*

The plaintiff concedes that the dip-coating method of insulating wire with Teflon is well known, but it claims that in *its* process it uses a secret chemical which facilitates production.

*As to (b):*

After describing in some detail the procedure for extruding Teflon onto wire the plaintiff concedes that such extrusion machines are commercially available,—there are at least two companies which manufacture them—but claims that it has added to the machine a tip and die of its own design, as well as an oven made to its own specifications, thereby making the machine operate more effectively.

*As to (c):*

It is conceded by the plaintiff that the procedure for the manufacture of Teflon tape is described in the available literature. It consists, according to the plaintiff, of the following separate operations: (1) extruding, (2) calendering to the desired thickness (passing the tape through a set of rollers which flatten the ribbon to a predetermined thickness), (3) extracting the extrusion oils.

The plaintiff claims that it has designed its equipment so that it can perform all of these operations in tandem without stopping. It claims that its die is of a unique design which permits a thin ribbon of Teflon to be extruded which makes it more malleable. It also claims that it extracts the extrusion oils by means of heat (the passage of the tape through an oven) and that this combination of factors is its secret.

*As to (d):*

The plaintiff concedes that there are three well known methods of increasing Teflon's "bondability" with other materials. Those are (1) sodium or naphthelene or chemical etching method (2) the graft polymerization or irradiated treatment method and (3) the ludox method.

The plaintiff, however, says that it uses none of these methods, but instead has developed its own two methods which are, (1) the in-plant or Hi-Bond A method, which contains certain ingredients in combination with a chemical "X", known only to certain designated persons in the plaintiff's employ, none of whom is a defendant, and (2) the polymer coat and AdBond method which is used in the manufacture of those two solutions (polymer coat and AdBond). The general area of polymer coat is patented, but the specific formula is not. AdBond is not patented. Both of these solutions are sold to others for their use. The plaintiff admits that a chemical analysis could be made of those solutions, but claims that they could be produced only with difficulty.

*As to (e):*

The plaintiff concedes that inks for marking Teflon insulated wire are available in the commercial market, but it contends that it has developed certain secret formulae for its inks which are more efficient.

*As to (f):*

Plaintiff admits that the potential users of Teflon are well known. However, it contends that it has accumulated a substantial body of information during its years in business as a result of which it has acquired (1) knowledge of specific projects in which Teflon is being used in the plants of various large business firms and their specific requirements, (2)

knowledge of the identity of specific buyers who purchase the Teflon requirements of these firms, (3) knowledge of the standards and specifications of various customers, all of which information is confidential.

At the hearing herein it developed that only the defendants Wong and Lockridge occupied positions of responsibility or authority with the defendant. Wong is an engineer who had operated a company known as Union Plastics Corporation, which manufactured insulated wire and cable. The firm was purchased by Hi Temp in August, 1957. The purchase arrangement provided that Wong was to be employed by the plaintiff for a period of three years under a written contract. He first acted as director of the plaintiff's Standards and Estimating Department and later as head of the "New Products Development" Department.

Lockridge had been employed by the plaintiff for some five years. At the time of his discharge in 1960, he served as Assistant Sales Manager of Hi Temp at a salary of $175 per week. His contact was with Hi Temp's customers, and not with the manufacturing phase of the business.

Pensa is a chemist who had been employed by the plaintiff for about five years. He began to work for Hi Temp in 1955 as an inspector at a salary of $1.50 an hour. At the time of his discharge he was earning $140 per week as a chemist. His duties at that time consisted of preparing bonding compounds from plaintiff's formulas.

Chan is the brother-in-law of Wong, and had been employed at Union Plastics prior to its purchase by Hi Temp. He was employed at Hi Temp as an operator of a "screw extrusion machine" handling vinyl materials. He never worked with Teflon.

Pollak was employed by Hi Temp for almost two years as an inspector of incoming materials. At the time of his discharge he was receiving an hourly wage of $2.01.

Jones was one of over thirty sales representatives who were independent contractors employed by Hi Temp. He, like Lockridge, had no contact with the manufacturing side of the business, but was concerned only with sales of Hi Temp's products.

Wilkens was a machinist who was also an independent contractor. Wong knew him during his operation of Union Plastics and prior to his employment by Hi Temp. Wilkens worked on the development of a continuous wire extruder for Hi Temp which was never successfully operated.

■ The plaintiff has the burden of establishing that it will suffer irreparable damage unless the preliminary injunction is granted. See Joseph Bancroft & Sons Co. v. Shelley Knitting Mills, Inc., 3 Cir., 268 F.2d 569; Bickley v. Frutchey Bean Co., D.C., 173 F.Supp. 516.

It must prove also (1) that it had trade secrets, (2) that they were disclosed to or learned by the defendants as the result of their work with Hi Temp, and (3) that the defendants either propose to use or reveal them or have already done so.

Trade secrets are defined in the Restatement of Torts, Section 757. Comment (b) as follows:

"A trade secret may consist of any formula, patterns, device or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. It differs from other secret information in a business in that it is not simply information as to single or ephemeral events in the conduct of the business * * *. A trade secret is a process or device for continuous use in the operation of the business. Generally, it relates to the production of goods as, for example, a machine or formula for the production of an article."

The following excerpt from the Restatement discusses the element of secre-

cy and the tests to be applied in determining whether a trade secret is involved. *"The subject matter of a trade secret must be secret.* Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret. *Substantially, a trade secret is known only in the particular business in which it is used.* It is not requisite that only the proprietor of the business know it. He may, without losing his protection communicate it to employees involved in its use. He may likewise communicate it to others pledged to secrecy. Others may also know of it independently, as, for example, when they have discovered the process or formula by independent invention and are keeping it secret. Nevertheless, a substantial element of secrecy must exist, so that, *except by use of improper means, there would be difficulty in acquiring the information.* An exact definition of a trade secret is not possible. Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." (Emphasis mine.)

█ Based on the foregoing tests, it is my opinion that the plaintiff has failed to establish the secrecy of its various processes. Its post hearing memorandum is replete with statements conceding that the various processes referred to are well known, but claiming that it has made certain modifications or refinements thereof which it contends are secret. As to those, if they are secret, which I doubt, there is no proof that they were disclosed to or learned by the defendants. It has also failed to show that it has suffered or is likely to suffer irreparable damage if an injunction *pendente lite* should not be granted. As a matter of fact it could show no damage since Dulon, at the time of the hearing herein, had just commenced the construction of its plant. Nor was there proof that it intended to engage in competition with the plaintiff. As Judge Kaufman said in Worthington Pump and Machinery Corp. v. Douds, D. C., 97 F.Supp. 656, at page 661, "Courts of equity should not use the extraordinary remedy of injunction merely to allay litigants' fears. Northrop Corp. v. Madden, D.C.S.D.Cal.1937, 30 F.Supp. 993; Skelly v. Dockweiler, D.C.S.D.Cal.1947, 75 F.Supp. 11."

In my opinion the case at bar is similar to the case of Kaumagraph Co. v. Stampagraph Co., 235 N.Y. 1, at page 9, 138 N. E. 485, at page 488, in which Judge Pound of the New York Court of Appeals said, "Plaintiff hired Chadwick and Scott to develop the process by means of knowledge they had acquired while working for Briggs under the English patents in England. It thereby acquired practical knowledge of processes shared only with a few. The burden was on it to establish, not only the possession of trade secrets, but also the transmission thereof to defendants. *The English patents were open to all. Knowledge obtained from them was not secret information obtained from plaintiff.* Scott and Chadwick possessed it. Many printers *on fabrics could learn enough therefrom to make transfer patterns."* (Emphasis added.)

Accordingly, the plaintiff's motion for an injunction *pendente lite* is denied and the temporary restraining order is vacated.

Submit findings of fact, conclusions of law and order in conformity herewith.