**CARTER–WALLACE, INC.**

v.

**The UNITED STATES.**

No. 322–67.

United States Court of Claims.

Oct. 15, 1971.

Stephen R. Lang, New York City, for plaintiff, George B. Finnegan, Jr., New York City, attorney of record. Morgan, Finnegan, Durham & Pine, Edward J. Ross, Louis A. Mangone, Breed, Abbott & Morgan, Jerome G. Lee, and George P. Hoare, Jr., New York City, of counsel.

James A. Curley and Howard E. Shapiro, Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant; Richard W. McLaren, Washington, D. C., Harry First, New York City, and A. David Spevack, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

DAVIS, Judge.*

This is an opening skirmish in a patent suit under 28 U.S.C. § 1498 to recover "reasonable and entire compensation" for unauthorized use by the United States of the invention described and claimed in U. S. Patent 2,724,720, "Dicarbamates of Substituted Propane Diols." Plaintiff owns the patent and filed its petition charging infringement of claims 1 and 4. Claim 4 is representative and reads "2-methyl-2-n-propyl-1,3-propane diol dicarbamate," which is a chemical compound or drug with the generic name "meprobamate." Meprobamate, and combination drug products containing meprobamate, have been sold by plaintiff and others under various trademarks, including "Miltown" and "Equanil," and have for many years been leading tranquilizer drugs for treatment of neurosis, anxiety and tension.

Defendant filed an answer asserting the usual defenses of patent invalidity and noninfringement. The answer also alleged that the patent is unenforceable because plaintiff "combined and conspired" to "restrain" and "monopolize" trade in meprobamate in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and that plaintiff has "misued its patent * * * to secure a monopoly beyond the scope of the patent * * *." Later, defendant filed a first amended answer adding paragraphs 22 through 33. Paragraphs 25 through 33 set out in detail certain alleged antitrust violations and patent misuse; and those paragraphs are the basis of the present dispute. The allegations challenge some of plaintiff's licensing, marketing and pricing practices with respect to the meprobamate patent.

Plaintiff has moved to strike paragraphs 25 through 33 or, in the alternative, for summary judgment dismissing those paragraphs. Defendant opposed both halves of the motion before the trial commissioner. He allowed the motion in its entirety, as one for summary judgment. In seeking review by the judges, defendant acquiesces in some of the commissioner's conclusions but challenges others. Because plaintiff's motion relies on affidavits and documents outside the pleadings, we treat it as a motion for summary judgment (as did the trial commissioner) rather than as a motion to strike.[1]

I

*Background*

The meprobamate patent issued to plaintiff in 1955. Shortly thereafter, plaintiff entered into a licensing arrangement with American Home Products Company ("American") under which American was granted the exclusive right (except for plaintiff) to use and sell meprobamate. American was not given the right to make meprobamate. Plaintiff retained that right for itself and agreed to supply American's requirements "at prices as may be mutually agreed upon." Plaintiff also retained the right to sell meprobamate to other pharmaceutical manufacturers for use in making combination drug products, but only after first discussing such proposed sales with American. The license contained other restrictive provisions, the details of which need not be set out here (they are set out at 211 F.Supp. at 146 infra), which were deemed by the Government to be violations of the antitrust laws. Accordingly, an anti-

---

* We have borrowed extensively fom the opinion of Trial Commissioner James F. Davis, although we come to different conclusions on certain aspects of the case.

1. On review of the trial commissioner's ruling, the Government urged strongly that it had not a fair opportunity before the commissioner to respond to plaintiff's motion for summary judgment, and

that as a result the commissioner was not adequately informed. We do not go into the details or the merits of that claim since defendant agrees that it has now had such a full and fair chance to make its arguments and present any documentation or affidavits on that motion. The issues all being legal, we consider them *de novo.*

trust suit was filed by the United States against plaintiff and American as codefendants in the District Court for the Southern District of New York. Before trial and after extensive negotiations, the suit was settled and a consent judgment entered. United States v. Carter Prod. Inc., 211 F.Supp. 144 (1962). The consent judgment contains many terms and conditions relating to plaintiff's licensing, marketing and pricing practices with respect to meprobamate; and the judgment was entered only after the court was satisfied that it was in the public interest. *See* 211 F.Supp. at 147, 148. In essence, the judgment requires plaintiff to sell meprobamate to any qualified pharmaceutical manufacturer at no more than a specified maximum price for unrestricted use and sale by such manufacturer. There are other conditions and qualifications in the judgment some of which will be noted later.

█ It is settled that courts will not aid a patentee in infringement litigation if the patentee, in dealing with the patent by licenses or product sales, engages in conduct violative of the antitrust laws or the principles of equity. Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 315 U.S. 788, 62 S.Ct. 402, 86 L.Ed. 363 (1942). Such conduct has come to be called patent misuse and is an application of the equitable doctrine that he who seeks equity must come into court with clean hands. When patent misuse and its consequences have been dissipated, however, the patentee is once again free to pursue his statutory remedy against infringers. Metals Disintegrating Co. v. Reynolds Metals Co., 228 F.2d 885, 889

(C.A. 3, 1956); Kins, Dissipation of Patent Misuse, 1968, Wis.L.Rev. 918.

The main question is whether the consequences of the patent misuse existing prior to the consent decree in 1962 were dissipated as a result of that judgment. Plaintiff notes that it has agreed to waive recovery against the United States for any infringement prior to November 9, 1962 (the date of the consent judgment), and argues that, accordingly, pre-1962 activities relating to licensing, marketing and pricing practices have no post-1962 relevance.[2] The affidavit of the attorney (Ross) who represented plaintiff in the antitrust litigation leading up to the consent judgment declares that the company promptly complied with the consent judgment and that it has unswervingly adhered to its terms ever since. Defendant does not dispute this statement (at least at the present stage of the litigation) and we must assume that it is so. The issue is whether, nevertheless, a proper defense of patent misuse has been stated. We treat separately with the various types of defense raised in the challenged paragraphs.

II

*Paragraphs 25, 26, 29*

█ Paragraphs 25, 26, and 29 of the amended answer relate to license agreements between plaintiff and American Cyanamid, entered into in 1957 and 1959; and plaintiff and Merck, entered into in 1956. The agreements provide that plaintiff sell meprobamate to the respective licensees which in turn will resell the meprobamate, but only in combination with certain other drugs.[3] Defendant

---

2. Because its petition here was filed September 14, 1967, plaintiff would ordinarily be entitled to recover for unauthorized use for the six-year period previous thereto, *i. e.*, back to September 14, 1961. *See* 28 U.S.C. § 2501 and 35 U.S.C. § 286. However, the memorandum of conference of December 4, 1968, reads in part:

"3. Plaintiff agreed to waive recovery against the United States of reasonable and entire compensation for any

use by the United States of the patented invention prior to November 9, 1962."

3. The 1957 and 1959 agreements permit American Cyanamid to resell meprobamate only in combination with tridihexethyl iodide and d-amphetamine sulfate, respectively. The 1956 agreement permits Merck to resell meprobamate only in combination with prednisone and/or prednisolone.

Under the license-agreements, Carter-Wallace receives both payment for the

says this practice is unlawful because plaintiff " * * * restricted the free use and alienation of meprobamate in the United States after plaintiff has sold the product * * * and parted with dominion and control thereover * *," citing, among other cases, United States v. Univis Lens Co., 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942) and United States v. Arnold, Schwinn & Co., 388 U. S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967).

Under Article IV of the consent judgment, plaintiff was "ordered and directed to offer to sell and to sell meprobamate compounds * * * without quantity discounts, and on unrestricted and nondiscriminatory terms and conditions, to every qualified pharmaceutical house placing a written order therefor," the maximum selling price to be "Twenty ($20.00) Dollars a pound" (adjusted for increases in the Consumer Price Index). Further, plaintiff was "ordered and directed to make every reasonable effort to assure a supply of meprobamate compound adequate to discharge its obligation * * *" under Article IV. Also, by Articles V and VI, plaintiff was "enjoined and restrained" from conditionally selling meprobamate or "entering into, adhering to, maintaining or enforcing any contract," the effect of which was to "prevent, limit, restrict or designate in any manner" the following: the uses to which meprobamate could be put; the sale of meprobamate by anyone to any qualified pharmaceutical house; the price, terms or conditions at which meprobamate drugs could be sold by any person; the persons to whom or the areas in which meprobamate or combination drugs could be sold by anyone; and the publication or dissemination by any pharmaceutical house of the results of research conducted by it. Article IX (H) provided, however, that "contracts in existence as of March 1, 1962," which includes the American Cyanamid and

Merck contracts, shall not be invalidated to the extent they provide for "payments for meprobamate compound and of royalties to Carter, or otherwise impose any limitations, restrictions or obligations on such person; provided, however, that if such person [e. g., American Cyanamid or Merck] is a qualified pharmaceutical house it shall be eligible to purchase meprobamate * * * from Carter in accordance with the provisions of this Final Judgment and for purposes other than those provided for in such contracts; * * *."

The upshot is this: (1) American Cyanamid and Merck, as well as other qualified pharmaceutical houses, were free after the consent judgment to buy meprobamate from plaintiff on nondiscriminatory terms for unrestricted use, except that (2) American Cyanamid and Merck were bound by the terms of the earlier licenses to sell only combination drugs insofar as they bought meprobamate at the price agreed to in the license, which was considerably lower than $20 per pound. If, however, American Cyanamid or Merck bought meprobamate at the price set out in the consent judgment (i. e., no more than $20 per pound), rather than that agreed to in the licenses, then they were free to make unrestricted use and sale of it. As already noted, we must assume (on this motion) that plaintiff Carter-Wallace has adhered to this scheme since 1962. We must also assume, nothing being suggested to the contrary, that the $20 figure set by the decree is a fair and viable one, at which other companies regularly buy the meprobamate.

Accepting this as the post-1962 situation, defendant urges that the continuance of the old license price, with its restriction on use, be held violative of the Sherman Act, 15 U.S.C. §§ 1, 2, or at least so inequitable as to bar suit on the patent. It was made clear to us at and after the oral argument that, with re-

bulk meprobamate and royalties on the licensees' sales of the combination drugs. The licensees are also required to make specified outlays to promote the com-

bination drugs and to make available to plaintiff their new-drug-applications for the combination drugs covered by the agreements.

spect to these paragraphs of the amended answer, defendant does not ask for a trial, or for an opportunity to present further evidence or materials. The defendant, as we understand it, does not desire to make any additional proof showing either that this post-1962 situation (with respect to American Cyanamid and Merck) constitutes a *per se* violation of the Sherman Act or is barred by the rule-of-reason or establishes an improper restraint on competition. The sole defense is that the system described above is illegal or improper on its face, without more and without any further showing. We decline to make such a ruling.

A. If plaintiff's practice under the consent decree is seen in the round, it is plain that it imposes no absolute restriction on the use of bulk meprobamate by American Cyanamid and Merck since those two companies, as all other qualified pharmaceutical houses, can purchase the drug at the decree's non-discriminatory (and fair) price for unrestricted use and disposition. What Carter-Wallace does is to set a lower price at which American Cyanamid and Merck can buy the meprobamate if they wish to use it in particular combinations. However, the vendee firms, if one looks at their business as a whole, are not prohibited or deterred from making any use they wish of the meprobamate.[4] Nor is any disadvantage (as compared to their competitors) placed upon them if they do.

There are perhaps some individual sentences in United States v. Univis Lens Co., 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942), and United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S. Ct. 1856, 18 L.Ed.2d 1249 (1967), which, taken in isolation, can be read as saying that each unit of the meprobamate must be considered by itself and independently —without regard to American Cyanamid's and Merck's business as a whole, or the whole of its dealings with Carter-Wallace. On that view, there is, *per se*, an unlawful restriction on the disposition of those particular units of the drug which are sold by plaintiff at the lower price. But we do not think that *Univis* and *Schwinn* understood in their setting, stand for that rigid and procrustean proposition, nor that the existing case-law supports any such rule. No decision of which we are aware calls the mere existence of differential pricing practices comparable to those now before us a violation of the Sherman Act.[5]

In *Univis Lens Company*, the corporation, which owned patents covering lens blanks and the processes of grinding and polishing them into eyeglass lenses, devised an elaborate licensing system under which one licensee was authorized to manufacture the blanks and to sell them to other licensees. There were three categories of purchaser-licensees (wholesalers, finishing retailers, and prescription retailers) and the patentee specified both resale prices and permissible classes of customers for each. Licensees were required to police each other, and violations of the price and customer restraints were punished by cancellation of the licenses. The Supreme Court struck down the entire licensing scheme as violating the Sherman Act, and held that the patentee could not legally control the prices at which the finished lenses were sold. That case is quite different. The licensees of Univis could not sell any lenses to persons and at prices other than those specified by Univis, while American Cyanamid and Merck, in contrast, can sell or dispose of the drug as they will, provided they pay the decree price everyone else pays; if that is done, Carter-Wallace has no right to control use or disposition.

4. It is even reasonable to assume, nothing else appearing, that if the vendees change their minds after purchasing the drug at the lower price they can make unrestricted use of it by paying the difference between that lower price and the consent-decree price.

5. The problem under the Clayton Act is discussed *infra*, under Part VII, with respect to paragraph 31 of the amended answer. The differential-pricing decisions cited there were decided after full hearing.

*Schwinn* is dissimilar in the same way. That bicycle manufacturer had a comprehensive distribution plan in which it allocated exclusive geographic territories to dealers and fixed the persons to whom they could resell. The Court found the territorial and customer restraints to be *per se* violations of the Sherman Act, saying that once a manufacturer sold his product to a dealer (as opposed to consigning it on an agency basis), and had thereby parted with title, dominion, and risk over it, "he may not reserve control over its destiny or the conditions of its resale." 388 U.S. at 379, 87 S.Ct. at 1865. Again, the vendor exercised an absolute and across-the-board right to control use, a right which the dealer could not readily avoid as the vendees can here.

Equally distinguishable, on the same general ground, are the lower court cases which might be invoked as parallel. Baldwin-Lima-Hamilton Corp. v. Tatnall Measuring Systems Co., 169 F.Supp. 1 (E.D. Pa.1958), aff'd, 268 F.2d 395 (C.A. 3), cert. denied, 361 U.S. 894, 80 S.Ct. 190, 4 L.Ed.2d 151 (1959); Hensley Equipment Co. v. Esco Corp., 383 F.2d 252 (C. A. 5, 1967); United States v. Glaxo Group, Ltd., 302 F.Supp. 1 (D.D.C.1969); *id.*, 163 U.S.P.Q. 668 (D.D.C.1969). Those decisions all involved absolute and unavoidable restrictions on use, not a special price differential if the product is used for a particular purpose, with the purchaser free to buy and use the commodity for any end if he pays the higher general price paid by other buyers.

Closer to our situation is the recent holding in Tripoli Co. v. Wella Corp., 425 F.2d 932 (C.A. 3), cert. denied, 400 U. S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970). Wella manufactured a line of cosmetics intended for professional use which it sold to Tripoli for wholesale distribution to barbers and beauticians. It terminated sales to Tripoli upon learning that the latter was also selling directly to consumers. The Third Circuit held that the customer-restraint imposed by Wella was not a *per se* violation of the Sherman Act. Saying that "*Schwinn* must be read, as must all antitrust cases, in its factual context," it refused to apply *Schwinn* beyond the particular territorial and customers restraints there involved. 425 F.2d at 936. In a rule-of-reason inquiry, the majority of the *en banc* court found Wella's restraints to be reasonable, emphasizing that the products could have dangerous results if improperly used and that the basic motivation of the manufacturer appeared to be to protect the public from injury and itself from product liability actions. The dissenters thought that a trial should have been held to see whether the restraints were in fact warranted, but none of the participating judges felt that the mere existence of the controls by the vendor was enough, in itself, to prove restraint on competition. The defendant argues here that the specific factors which impelled the Third Circuit to resolve its inquiry in the manufacturer's favor are not present in Carter-Wallace's case, but that contention is considerably off-target; the point is that the *Tripoli* court, embarking on a "rule-of-reason" analysis after and cognizant of *Schwinn*, thought that the Supreme Court's opinion did not automatically outlaw any and all post-sale restrictions. Indeed, the restrictions in *Tripoli* were much stronger and more burdensome than the readily avoidable limitation involved here.

We conclude, therefore, that existing case-law does not sustain the Government's defense that an antitrust violation is made out by what has been presented to us with respect to paragraphs 25, 26, and 29 of the amended answer, even in the absence of any further showing.[6]

■ B. If we consider the matter afresh, taught by the fundamental postulates of antitrust law, we reach the same

---

6. We discuss *infra*, paragraph 31 of the answer as to which the defendant asks for further proceedings to prove a violation of the Clayton Act. The Government does not urge, with respect to that particular defense, that a case is made out by the pleadings and the now-admitted facts.

result.[7] Conduct which can conceivably violate the Sherman Act may be examined in terms of three basic variables: (1) its economic effects, positive (furthering efficient performance of economic functions) and negative (anticompetitive impact on the free play of market forces); (2) the power of the parties in the markets which they serve; and (3) the motives underlying the conduct. A full rule-of-reason standard requires scrutiny of all three variables before a judgment is reached that a given practice is "reasonable" (permissible under the Act) or "unreasonable" (proscribed). A rule-of-reason inquiry may also eliminate examination of one or more elements, so that, for instance, anticompetitive effect will be assessed but motive excluded as immaterial.

■ At the other end of the spectrum from the full rule-of-reason test is the strict *per se* rule, which characterizes the mere existence of a practice as a violation of the Act, rendering irrelevant further inquiry into the actual circumstances and effect. Such a rule establishes a conclusive presumption that a kind of action has improper anticompetitive effects, a presumption which governs regardless of whether the particular conduct in its actual context has been proved to have those consequences. Courts impose these presumptions where (1) they have had sufficient prior experience with a type of action to feel justified in concluding that previously discerned anticompetitive effects will always or nearly always be present once the existence of a practice is shown or (2) even without that actual experience the court reaches the same conclusion through analysis. The key elements of a *per se* (or like) rule are, accordingly, an absolute prohibition of certain conduct and a limitation on judicial inquiry into the factual context of that action. The advantages of a *per se* rule track those elements: absolute rules provide clear guidance for businessmen and their legal advisers, and the limitation of inquiry avoids what can often be protracted or unnecessary judicial delving into factual areas, such as economic causation, which can be complex, difficult, and speculative. The prime disadvantage is the "margin of error," that is, the likelihood that the presumption imposed will be at odds with the facts in the particular case. "[I]t is desirable to make use of them [such presumptions] only when the harm that may result from error is clearly outweighed by the savings in social cost which the presumptions afford." Blake & Pitofsky, Antitrust Law (1967), at 493.

An assessment of the possible "margin of error" in this case persuades us against characterizing the mere existence of the price differential, on its face, as a violation of the Sherman Act or an improper restraint on competition. Under Carter-Wallace's licensing scheme, as we have stressed, any qualified pharmaceutical house, including American Cyanamid and Merck, can purchase bulk meprobamate at fair and nondiscriminatory prices for unrestricted use, but plaintiff also sells the drug at the lower price to American Cyanamid and Merck for a particular use. If a factual inquiry were had, Carter-Wallace might be able to show that this price differential has in fact no anticompetitive effects on the market for meprobamate. Judge Mansfield so suggested in his opinion in Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp., 443 F.2d 867, 894 (C.A. 2, 1971). He noted that "[t]here is no suggestion that others want the lower prices on the same basis for use in combination drugs, or that others would be refused such terms."[8] Carter-Wallace

---

7. Our analysis follows Blake & Pitofsky, Antitrust Law (1967), at 492–493.

8. The part of Judge Mansfield's opinion dealing with patent misuse is as follows: "Since I would affirm the district court's decision, some reference should be made to the antitrust misuse defenses which the majority, because it reverses, did not reach. These defenses strike me as not having any merit. Assuming *arguendo* that the post-sale restrictions in Carter's 1956 agreement with Merck and its 1957

also alleges facts that are relevant to its motive in making the lower price available for the use of meprobamate in combination drugs. It says that the licenses impose obligations on Cyanamid and Merck, in addition to the initial payment for the drug, which inure to plaintiff's benefit—it receives royalties based on sales of the combination drugs and is given new-drug-applications, thereby avoiding the effort and expense of developing them itself. The licensees are also required to make specified expenditures for promotion of the drugs. What Carter-Wallace seems to be arguing in this connection is that it lowers the initial price of meprobamate purchased for use in combination drugs because of these other obligations placed on the licensees, and that those obligations are part of its compensation for the drug; the initial charge would be a type of down payment rather than the entire purchase price. Of course, all these propositions are still hypotheses, and they may not be accurate in actual fact, but there is enough of a possibility that plaintiff's actions could be justified (or shown to be noninjurious) to counsel against a conclusive presumption of anticompetitive taint which would warrant the automatic and unqualified rule defendant proposes.[9] And, as we noted at the outset, defendant does not ask for any trial or further inquiry on this particular defense.

Finally, we should point out that, although meprobamate is patented, we are, in this discussion of a possible Sherman Act violation or clear restraint of competition under paragraphs 25, 26, and 29, treating the drug as if it were unpatented, since it is our view that there was no such on-the-face violation or restraint even if the principle of the *Univis, Schwinn,* and like cases applies in full force to patentees and to patented articles. We have no occasion, therefore, to consider the mooted issue of whether there are exceptions for patented goods from the coverage of the doctrine relating to post-sale restrictions as enumerated in *Schwinn* (and *Univis*), and if so what those qualifications are. We are satisfied that, even if meprobamate is dealt with as unpatented, paragraphs 25, 26, and 29 of the amended answer do not show—in and of themselves, and without more—a proper defense of antitrust violation or restraint of competition.

## III

### *Paragraph 33* [10]

Defendant asserts in paragraph 33 that plaintiff charges its customers "un-

---

and 1959 agreements with Cyanamid, under which it sold meprobamate for use *only* in particular combination drugs, violated the antitrust laws when executed, which is a doubtful proposition at best, any illegality was eliminated by the 1962 Consent Decree. The latter obligated Carter to sell bulk meprobamate to all qualified pharmaceutical houses, including Cyanamid and Merck, at the maximum non-discriminatory price of $20 per pound (plus increases based on the Consumer Price Index) and the Cyanamid and Merck agreements were amended accordingly to *permit* rather than *require* that meprobamate be used in the combination drugs. Thereafter Cyanamid and Merck, like some 100 other pharmaceutical houses which purchased bulk meprobamate from Carter (Sigerson Aff. p. 5), were free to buy bulk meprobamate and resell it without restraint. The earlier agreements, as thus amended, were continued in effect only to permit Carter to continue charging those companies the lower prices theretofore specified in the agreements for meprobamate used in the combination drugs. There is no suggestion that others want the lower prices on the same basis for use in combination drugs, or that others would be refused such terms. Thus any antitrust misuse has long since been purged or dissipated."

Judge Friendly, for himself and Judge Feinberg, found it unnecessary to reach or consider this question.

9. We are mindful, too, of the frequent sales by vendors (of all types) at lower prices to charitable organizations, ministers, teachers, etc., often with the implicit or express requirement that the item not be resold at a profit. *Cf.* Singer Co. v. United States, Ct.Cl., 449 F.2d 413.

10. Trial Commissioner Davis held the defense alleged in paragraph 33 to be invalid, and the Government does not seek review of that holding. This portion of

reasonably high, exorbitant and oppressive prices for bulk meprobamate," and that plaintiff has "established and fixed by agreement with its customers the floor price below which these customers cannot economically manufacture and sell meprobamate * * * which conduct is inequitable and amounts to a misuse of the meprobamate patent * * *."

■ This defense is without merit for two reasons. First, as a general rule and absent any overriding unlawful conduct, patentees can charge for their patented products and licenses whatever the market will bear. Brulotte v. Thys Co., 379 U.S. 29, 33, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964); Stearns v. Tinker & Rasor, 252 F.2d 589, 604 (C.A.9, 1957); Norwich Pharmacal Co. v. United States, 164 USPQ 91 (Ct.Cl.Comm'r.1968), aff'd, in an unreported order dated December 6, 1968.

■ Second, and of particular importance here, the maximum price which plaintiff can charge its pharmaceutical-house customers for meprobamate is $20 per pound, adjusted from time to time by changes in the Consumer Price Index over the last index for the month of June 1962. This pricing arrangement was expressly agreed to by the Government and plaintiff in the earlier antitrust litigation, and was adopted by the District Court as Article IV(C) of the consent judgment. As we have said, defendant does not suggest that plaintiff has violated this requirement. It is pertinent to note that the Government's brief in the antitrust case stated that the "Government is satisfied that the maximum price of $20.00 per pound of meprobamate compound will encourage and permit the entry of competitors in this heretofore pre-empted market." Also, the District Court opinion, 211 F.Supp. at 148, noted that "the maximum price of twenty dollars will enable them [i. e., other pharmaceutical houses], as well as

Carter and American [Home Products Company], to make a handsome profit and at the same time substantially reduce the price of the tranquilizing and combination drugs to the consuming public." We are given no reason for thinking the situation has changed. In any event, an attack on the pricing arrangement set out in the consent judgment, e. g., as no longer in the public interest because of some changed factual circumstances, should be made directly in the District Court for the Southern District of New York, and not in this court. The consent judgment provides (Article XIII) that the District Court retains jurisdiction "for the purpose of enabling any of the parties * * * to apply * * * at any time * * * for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, [or] for the amendment or modification of any of the provisions thereof * * *."

IV

*Paragraph 30* [11]

■ By a contract dated January 1, 1958, Merck granted plaintiff a license under U.S. Patent 2,784,141 (the "benactyzine patent") to "make, use and sell" combination drug products containing meprobamate and a chemical called benactyzine. Defendant challenges one provision of the contract, *viz*, a clause by which plaintiff agreed not to "contest the validity of any patent of MERCK which may be licensed hereunder * *," which includes the benactyzine patent. Defendant contends that the benactyzine patent is "invalid" and that "plaintiff knew and believed that this patent was invalid and void prior to accepting a license thereunder on January 1, 1958," which, says defendant, amounts to a "misuse of the meprobamate patent."

■■ As a matter of law, defendant's position is without merit. The benacty-

---

our opinion incorporates the relevant part of the commissioner's opinion with some minor changes.

11. Defendant does not ask review of the trial commissioner's adverse ruling on this paragraph. Our opinion incorporates that part of the commissioner's opinion.

zine patent is not germane to this suit. Merck, not the plaintiff, owns the benactyzine patent and no infringement of that patent has been or could be alleged here. Misuse defenses must be directed to the patent or patents alleged to be infringed. *See* McCullough Tool Co. v. Well Surveys, Inc., 395 F.2d 230 (C.A. 10), cert. denied, 393 U.S. 925, 89 S.Ct. 257, 21 L.Ed.2d 261 (1968), and cases cited therein. Not every allegation of misconduct on the part of a plaintiff, even if true, constitutes a bar to suit under the clean-hands doctrine. The misconduct must be "in relation to or in all events connected with the matter in litigation * * *." *See* Ohio Oil Co. v. Sharp, 135 F.2d 303, 307 (C.A.10, 1943).

Furthermore, on January 9, 1970, Merck unilaterally deleted the disputed provision from the contract, noting that the Supreme Court's decision in Lear, Inc. v. Adkins, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), "suggests such provisions are unenforceable from now on." Prior to the *Lear* case, such provisions were deemed proper. Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950).

### V

*Paragraph 27* [12]

On May 1, 1957, plaintiff and American Cyanamid entered into a contract under which American Cyanamid agreed to prepare for plaintiff tablets containing meprobamate and tridihexethyl iodide. Plaintiff furnished bulk meprobamate to American Cyanamid and American Cyanamid furnished the tridihexethyl iodide, on which it held a patent. In turn, plaintiff paid American Cyanamid a fee covering the tridihexethyl iodide and processing costs. The provision of the contract alleged by defendant to be a misuse of the patent in suit provides as follows:

Sales of Tablets prepared for you [plaintiff] hereunder will not carry with them the right for their use or sale under our [*American Cyanamid*] *patent rights* * * * in countries other than the United States, * * * and Canada, and you shall notify customers to which you sell Tablets [Emphasis supplied.]

Defendant says that, by such provision, plaintiff "agreed not to compete with American Cyanamid * * * outside the United States and Canada, to divide with American Cyanamid the international market for combination tablets of meprobamate and tridihexethyl iodide, which conduct is * * * illegal under the Sherman Act (15 U.S.C. § 1), and amounts to a misuse of the meprobamate patent * * *."

Plaintiff says that the consent judgment (Article IX(H)) expressly sanctions the contract provision, above quoted. However, for the same reasons discussed *infra* with respect to paragraph 32 and the meprobamate supply contracts, it is not clear on this record whether Article IX(H) was intended to cover the instant contract. Summary judgment on basis of the consent judgment is not appropriate.

Summary judgment is, however, appropriate on other grounds. First, the contract provision deals with restrictions placed on plaintiff by American Cyanamid under American Cyanamid patents. The provision does not deal with restrictions imposed by plaintiff on others under the meprobamate patent. Thus, for reasons noted earlier with respect to paragraph 30, the allegations of paragraph 27 do not make out a misuse of the meprobamate patent but, at most, relate only to possible misuse by American Cyanamid of its patents, none of which is here in suit. *See McCullough Tool Co., supra; Ohio Oil Co., supra.*

Second, and in any event, Ross states in his affidavit that, by 1959, plaintiff had stopped selling combination drugs comprising meprobamate and tri-

---

12. Defendant does not seek review of the trial commissioner's adverse holding on this aspect of the case. Our opinion incorporates the part of the commissioner's opinion treating with paragraph 27.

dihexethyl iodide;[13] that in 1958, the May 1, 1957, contract was amended to include tridihexethyl chloride; and that since 1959, plaintiff has sold a combination drug comprising meprobamate and tridihexethyl chloride rather than meprobamate and tridihexethyl iodide. Furthermore, pursuant to another contract, dated December 15, 1959, plaintiff was permitted to sell the combination drug of meprobamate and tridihexethyl chloride "outside the United States and Canada." Simply stated, this means that the alleged unlawful effect of the sales arrangement challenged in paragraph 27 no longer exists; and, thus, even assuming *arguendo* that the meprobamate patent was misused, such misuse has been dissipated.

## VI

### Paragraph 28 [14]

By contract dated July 28, 1964, and amended February 10, 1965, plaintiff granted to American Cyanamid and its foreign subsidiaries a "non-exclusive royalty-free right and license under CARTER's *foreign* [meprobamate] patents * * *, to use and to sell, but not to make, meprobamate to the extent required to make the combination product [meprobamate and tridihexethyl chloride] * * * in any of the [*foreign*] countries listed in * * * Schedule A * * * and to use and sell in any such country combination product so made * * *." [Emphasis supplied.] Schedule A listed 48 foreign countries in which plaintiff had been granted patent rights to meprobamate or had pending patent applications. The 1965 amendment to the 1964 contract added a provision that Canada be included with the countries listed in Schedule A. A letter agreement dated July 28, 1964, which accompanied and supplemented the basic contract of the same date, provided that all the meprobamate made and sold under the con-

tract would be "manufactured outside the United States;" and it also provided that plaintiff would "cause our foreign subsidiaries to sell and that you and your sublicensees will purchase from our * * * subsidiaries all quantities of meprobamate powder which you and they may require to make and sell the combination product so made throughout the world *except in * * * Austria, Japan, South Vietnam, Taiwan and Thailand where we have existing commitments.*" [Emphasis supplied.]

Defendant contends that the requirement that American Cyanamid's foreign subsidiaries and sublicensees not sell the licensed combination drug product in Austria, Japan, South Vietnam, Taiwan, and Thailand is a violation of § 1 of the Sherman Act and constitutes misuse of the patent in suit. Paragraph 28 of the amended answer says that "plaintiff and its subsidiaries do not have patent coverage on meprobamate in the aforesaid territories" and that plaintiff "has illegally divided world markets" and "prevented American Cyanamid from competing with plaintiff * * * in the aforesaid territories * * * which conduct is * * * illegal * * * and amounts to a misuse of the meprobamate patent * * *." Plaintiff, on the other hand, says defendant's allegations are insufficient as a matter of law. It notes that the agreements alleged to be illegal under the Sherman Act are based solely on foreign patents, relate only to operations and transactions outside the United States, and have nothing to do with United States commerce or the United States meprobamate patent. Accordingly, says plaintiff, the agreements cannot constitute misuse of the United States meprobamate patent.

Analysis of the contracts in dispute, in light of the consent judgment, supports plaintiff's position. The contracts deal

---

13. Defendant does not challenge the Ross affidavit, pursuant to Rule 101(f). Its factual allegations are therefore deemed true.

14. Defendant does not request review of the trial commissioner's adverse holding on paragraph 28. Our opinion incorporates that part of the commissioner's opinion, with a minor change.

only with meprobamate made outside the United States by foreign corporations under foreign patents for sale and use outside the United States. As earlier discussed with respect to paragraphs 27 and 30, patent misuse defenses must stem from illegal or inequitable conduct under the patent or patents in litigation. Clearly, the agreements here in dispute relate in no way to the United States meprobamate patent, but rather deal only with foreign patents.

It is also pertinent to note that, under the consent decree, American Cyanamid and all other qualified pharmaceutical manufacturers are free to buy meprobamate from plaintiff for use or resale without restriction. Under Article VI of the consent judgment, plaintiff cannot "prevent, limit, restrict or designate in any manner: * * * (4) the persons to whom or *the areas* in which meprobamate tranquilizing drugs or *combination drugs* may be sold *by any person; * * *.*" [Emphasis supplied.] Quite simply, this means that American Cyanamid is free to sell in Austria, Japan, South Vietnam, Taiwan, and Thailand combination drugs made from meprobamate purchased from plaintiff in the United States. In reality, therefore, the restriction on sales by American Cyanamid in world markets does not exist.

## VII

### *Paragraph 31*

 Defendant charges in paragraph 31 that plaintiff misused the patent in suit because it "discriminates among its customers in the sale of bulk meprobamate by charging American Cyanamid and Merck prices substantially lower than it charges the remainder of its customers * * * which conduct is inequitable, illegal under Section 2(a) of the Clayton Act (15 U.S.C. § 13(a)) * * *." Defendant relies on Laitram Corp. v. King Crab, Inc., 244 F.Supp. 9 (D.Alaska), modified, 245 F.Supp. 1019 (D.Alaska 1965), which held, among other things, that discriminatory and

unjustified royalty rates between different lessees of patented machines, made and leased by the patentee, amounted to patent misuse. Unlike its position on paragraphs 25, 26, and 29 (and the Sherman Act), the Government does seek further proceedings on paragraph 31 (relating to the Clayton Act) and does not ask the court to hold in its favor, at the present stage, as a matter of law.

As already pointed out, the consent judgment permits plaintiff to sell meprobamate to American Cyanamid and Merck at prices other than $20 per pound (the maximum under the consent judgment), to the extent that such sales are pursuant to the conditions of the prejudgment license contracts. Article IX says:

> Nothing contained in this Final Judgment shall be construed to :'
>
> *　*　*　*　*　*
>
> (B) Enjoin or restrain Carter from making sales of meprobamate compound to persons other than American [Home Products Company], for the duration of its contracts or agreements with such persons, if such contracts or agreements were in existence on March 1 1962, at the price provided for in such contracts or agreements, even though such price may differ from the price at which Carter shall sell meprobamate compound under Section IV herein [*i. e.*, $20 per pound maximum] ;

Furthermore, clause (H) of Article IX supplements clause (B), and provides, as earlier noted, that restrictive conditions in the prejudgment license contracts shall not be invalidated insofar as they provide for pricing arrangements for sales of meprobamate to American Cyanamid and Merck for use in making combination drug products.

Plaintiff does not now argue that these parts of the consent decree collaterally estop the Government from attacking, in the current proceeding, the lawfulness of the American Cyanamid and Merck license agreements, or of the

price-differential sanctioned by those agreements. The introductory paragraph of the consent judgment provides that it will not constitute an estoppel against either party:

Plaintiff, United States of America having filed its complaint herein on January 27, 1960, the defendant Carter Products, Inc., having appeared and filed its answer to the complaint denying the substantive allegations thereof, and the plaintiff and said defendant, by their respective attorneys, having consented to the entry of the Final Judgment *without trial or adjudication of any issue of fact or law herein, and without any admission by or estoppel of either party as to any such issue* * * *. (Emphasis supplied.)

Since 1940 the Department of Justice has publicly interpreted its antitrust consent decrees as not barring the Government from attacking activities excluded from the judgment; the exception from the decree of those activities does not signify that they are authorized but simply that they remain as vulnerable to attack as if the decree had not been entered.[15]

Pursuant to this understanding, the defendant maintains that the inclusion in the consent judgment of Section IX (B) and (H) *supra,* did not constitute approval of the legality of plaintiff's agreements with American Cyanamid and Merck, but was simply a caveat to show that these practices were not prohibited by the judgment and, if continued, would not render plaintiff liable for contempt for violating the consent judgment. The defendant also says that the consent judgment proceedings did not involve the legality of the Cyanamid and Merck license agreements which were not in issue there.

Since plaintiff does not now press the point that defendant is technically estopped by the consent judgment, and since the decree states explicitly that there is no estoppel, we accept that view. As with paragraphs 25, 26, and 29, *supra,* the question remains, however, whether the new situation after 1962 has resulted in a purge of any prior antitrust violation. Here, however, the Government does not argue that we can now hold, as a matter of law, that the Clayton Act has been violated since 1962 or that the price-differential constitutes patent misuse. The request is merely that we not strike the defense at this time, but permit the Government to pursue the matter further.

In this instance, we agree with the defendant that it should have the right to go forward. An important factor is that there have been cases in the past decade which at least lend color to, and may even directly support, the Government's position that differing prices or royalties to licensees can be improper and discriminatory. *See* Laitram Corp. v. King Crab, Inc., *supra*; LaPeyre v. Federal Trade Comm'n, 366 F.2d 117, 118–121 C.A.5, 1966) ; Peelers Co. v. Wendt, 260 F.Supp. 193 (W.D.Wash.1966). Such a development in the law would have to be taken into account even if the 1962 consent judgment did raise a technical estoppel. *See* Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 599–600, 606, 68 S.Ct. 715, 92 L.Ed. 898 (1948). All the more so if, as we hold and plaintiff concedes, there is no estoppel in law from this consent decree. *Cf.* United States v. International Bldg. Co., 345 U.S. 502, 73 S.Ct. 807, 97 L.Ed. 1182 (1953). The Supreme Court has emphasized that a prior antitrust consent judgment does not normally bar litigation of conduct occurring after the prior

15. See Dabney, Antitrust Consent Decrees: How Protective an Umbrella? 68 Yale L.J. 1391, 1401, n. 31 (1959) ; Isenberg & Rubin, Antitrust Enforcement Through Consent Decrees, 53 Harv. L.Rev. 386, 394–395 (1940) ; Note, Modification of Consent Decrees, 63 Harv.L. Rev. 320, 327–328 (1949). The Attorney General's policy was stated on December 16, 1940, in a press release issued in connection with the consent judgment in United States v. National Container Assoc., 1940–43 Trade Cas. ¶ 56,028, at 84 (S.D.N.Y.1940). This policy statement was widely publicized.

decree, even if the conduct is of the same type. Lawlor v. National Screen Service Corp., 349 U.S. 322, 327–329, 75 S.Ct. 865, 99 L.Ed. 1122 (1955); *see, also,* Cream Top Creamery v. Dean Milk Co., 383 F.2d 358, 363 (C.A. 6, 1967); Exhibitors Poster Exchange, Inc. v. National Screen Service Corp., 421 F.2d 1313 (C.A.5, 1970), cert. denied, 400 U.S. 991, 91 S.Ct. 454, 27 L.Ed.2d 439 (1971). Plaintiff argues that the 1962 judgment should at least be viewed as reflecting the Government's then view that the Merck and American Cyanamid contracts were lawful. Even on that assumption, the passage of almost nine years' time, with possible changes in circumstances and the accumulation of experience under the decree—together with the new decisions to which we have referred—would prevent us from giving conclusive effect to the Government's past position so as to bar all inquiry into the post-1962 facts or the current situation.

For these reasons, we reject plaintiff's motion for summary judgment on the defense set forth in paragraph 31 of the answer, and permit the defendant to go forward on that defense. We intimate no views at all on the merits of the defense, or whether the Government will be able to sustain it. All we do is rule that a triable issue has been raised and refuse to strike down the defense at this early stage when we have insufficient information as to the relevant facts and circumstances.

## VIII

### *Paragraph 32*

 Between 1955 and 1962, plaintiff entered into six supply contracts for production of meprobamate. Under all the contracts, the suppliers [16] made meprobamate solely for plaintiff. In turn, plaintiff sold meprobamate to the trade. In this way, plaintiff remained the only source of meprobamate, a right secured to it by virtue of its patent. In paragraph 32, defendant challenges certain of the terms and conditions of the supply contracts as constituting "a misuse of the meprobamate patent rendering it unenforceable against defendant." Among other things, the contracts provide that the suppliers maintain in confidence all "confidential technical information" made known to them by plaintiff in furtherance of meprobamate production. The contracts further provide that the suppliers require their employees, to whom confidential information is made known, not to disclose such information to unauthorized persons; and that such employees agree not to "be employed on * * * [their] own behalf or by others in the making of such product, for a period of two (2) years after termination of [their] present employment." All this, says defendant, is unlawful because it "unreasonably restricts the rights of the manufacturers and their employees to utilize such information and knowledge not covered by valid patent claims in competition with plaintiff, and unreasonably restricts the freedom of the aforesaid employees to seek new employment * * *."

Plaintiff answers that summary judgment dismissing paragraph 32 is appropriate on one or both of alternative grounds: (1) the consent judgment expressly sanctions the terms and conditions of the supply contracts; or (2) the defense is insufficient as a matter of law. With respect to the first ground, plaintiff points to Article IX(H) of the consent judgment which, as earlier noted, says that nothing contained in the judgment shall "[i]nvalidate *any provisions of any contracts in existence as of March 1, 1962 between Carter and any person* other than American [Home Products Company] insofar as such provisions provide for payments for meprobamate

---

16. The suppliers and the dates of the contracts are as follows: Millmaster Onyx Corp. (Chemical Division), June 27, 1955; J. T. Baker Chemical Co., December 7, 1955; Crestwood Chemical Co., April 6, 1956, Food Machinery & Chemical Corp., June 4, 1956; Dow Chemical Co., July 13, 1956; Abbott Laboratories, September 26, 1962.

compound * * * to Carter, or otherwise *impose any limitations, restrictions or obligations on such person * * *.*" [Emphasis supplied.] Despite the all-embracing language of Article IX(H) to include "any contracts in existence as of March 1, 1962," it is not clear on this record that such Article was intended to apply to the supply contracts as well as the license contracts by which plaintiff sold meprobamate to others for use in making combination drug products. It would appear that Article IX(H) applies only to the license contracts because it speaks in terms of payments *to* plaintiff and of persons who *buy from* plaintiff (licensees) rather than *sell to* plaintiff (suppliers). Also, it is not clear on this record whether the supply contracts were even considered by the parties and the District Court in formulating and entering the consent judgment. Plaintiff says the supply contracts were so-considered. However, even if relevant, this is a question of material fact, and, accordingly, summary judgment dismissing paragraph 32 on basis of the consent judgment is not appropriate.[17]

 Plaintiff's alternative ground is that the contracts in question are restricted to proprietary information and do not cover information in the public domain. It is not improper for a contractor to require that proprietary information disclosed to manufacturing suppliers be kept confidential, so long as such information is not in the public domain and is related to and necessary for the performance of the contract. *See* Jones v. Ulrich, 342 Ill.App. 16, 95 N.E. 2d 113 (1950); A. F. Holden Co. v. O'Brien, 73 USPQ 481 (E.D.Pa.1947); Rubner v. Gursky, Sup., 21 N.Y.S.2d 558

(1940). Conversely, it is impermissible for a patentee to restrict, or attempt to restrict, the dissemination of information which is within the public domain. *Cf.* Scott Paper Co. v. Marcalus Mfg. Co., 326 U.S. 249, 256–257, 66 S.Ct. 101, 90 L.Ed. 47 (1945); Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 117–118, 66 S.Ct. 101, 90 L.Ed. 47 (1938); Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 231–232, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964); Lear Inc. v. Adkins, 395 U.S. 653, 670, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969).[18]

 The difficulty here is that, with defendant's showing on this motion, we cannot say at this time that the contract provisions, as actually applied by the parties, are all within legitimate bounds. Enough doubt has been cast to raise a triable issue of fact.

The starting point is that, by common consent, the patent in suit is not a process patent and does not cover process technology. Some part of the processes used by the six suppliers may have been confidentially developed by Carter-Wallace and transmitted to the suppliers as a trade secret, but there is as yet no showing, and no present reason to believe, that all the process technology is such proprietary information. So far as we now know, a substantial part of it lies in the public domain.

Defendant points out that at least four of the six supply agreements (Abbott, Baker, Fairfield, and Millmaster) require the supplier to hold in confidence (until permission to disclose is granted) *all* information concerning the product and all "technical information" which has been supplied or may be supplied by Carter—regardless, apparently, of wheth-

17. This discussion is wholly apart from the point, discussed *supra* with respect to paragraph 31, that the consent decree does not estop the Government. That point furnishes another ground why summary judgment is improper on paragraph 32.

18. *See, also,* Bickley v. Frutchey Bean Co., 173 F.Supp. 516, 524 (E.D.Mich. 1959), aff'd per curiam, 279 F.2d 685

(C.A. 6, 1960); Wheelabrator Corp. v. Fogle, 317 F.Supp. 633 (W.D.La., 1970); National Lockwasher Co. v. George K. Garrett Co., 137 F.2d 255, 256 (C.A. 3, 1943); Park-In Theatres, Inc. v. Paramount-Richards Theatres, Inc., 90 F. Supp. 727, 730 (D.Del.), aff'd per curiam, 185 F.2d 407 (C.A. 3, 1950), cert. denied, 341 U.S. 950, 71 S.Ct. 1017, 95 L. Ed. 1373 (1951).

er such information constitutes a trade secret or is in the public domain. That is what the terms of the documents seem to say, or at least can be read as saying. In addition, defendant shows that the agreements these four suppliers extract from their employees (pursuant to its contractual agreement with plaintiff) forbid disclosure for a two-year period "even though such information should go into the public domain." [19]

The terms of both of these sets of contractual agreements are enough to raise a triable issue whether the restrictions are confined to true confidential data or whether non-secret information is also being suppressed. That question is not, and cannot be, resolved on the present skeleton record.

To this must be added the two-year period of post-employment non-disclosure required of employees. Reasonable limitations are allowable for truly confidential information, but we cannot say, without further proof, whether or not two years is reasonable in the circumstances here, especially since the patent expires in November 1972, little more than a year away. We have nothing tangible to go on in testing the validity of the two-year period. Some factual inquiry is therefore called for.

Accordingly, we cannot grant plaintiff's motion for summary judgment on paragraph 32. Issues of fact must first be threshed out.

## CONCLUSION

Plaintiff's motion to dismiss paragraphs 25 through 33 of defendant's first amended answer is allowed as to paragraphs 25, 26, 27, 28, 29, 30, and 33, and those paragraphs are dismissed. The motion is denied as to paragraphs 31 and 32, and further proceedings will be had, including proper discovery, on the defenses alleged in those paragraphs. Moreover, there still exist in defendant's answer, filed March 29, 1968, paragraph 20 and 21 which allege, generally, inequitable or unlawful conduct by plain-

tiff. Under those paragraphs, defendant is free to pursue discovery to make out defenses, as appropriate and not inconsistent with this opinion, regarding (1) any noncompliance by plaintiff with the consent decree and (2) any activities of plaintiff subsequent to the entry of the consent decree which are relevant to the allegations of paragraphs 20 and 21.

The case is remanded to the trial commissioner for further proceedings consistent with this opinion.

NICHOLS, Judge, concurring:

The plaintiff's action against the United States, if maintainable, is one under the Fifth Amendment and 28 U.S.C. § 1498, as amended, to recover just compensation for a taking under the power of Eminent Domain. Richmond Screw Anchor Co. v. United States, 275 U.S. 331, 48 S.Ct. 194, 72 L.Ed. 303 (1928); Irving Air Chute Co. v. United States, 93 F.Supp. 633, 117 Ct.Cl. 799 (1950). The role of the United States is therefore entirely different from that of an ordinary infringer, which it is not.

The statute originally recited that the United States had a right to any general or special defense available to a defendant in a patent infringement suit. This was later omitted because the Code reviser had the impression it was unnecessary; however, this court has attached meaning to such a change despite the reviser's belief he was effecting no change. Schmid v. United States, 436 F.2d 987, 193 Ct.Cl. 780 (1971). The change, however, has but a minor part in my thinking, the major factor being the U. S. Constitution.

My question is, simply, this: can the doctrine that the infringer can have the use of the patent free of charge if the patentee has abused the patent, whether or not to the infringer's detriment (see Greenberg, Unclean Hands as a Defense to Patent Infringement, 50 J. Pat. Off. Soc'y 12 (Jan. 1968)), be incorporated bodily into a suit such as this to main-

19. The Millmaster agreement differs slightly in wording but is to the same effect.

tain a constitutional right when the United States is a taker, not an infringer? This defense had its origin in the equitable doctrine of unclean hands and was invoked against patentees seeking equitable relief. *E. g.*, Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). I am not aware of any other situation where such an equitable doctrine is invoked to forfeit a claim for Fifth Amendment just compensation, which is, of course, on the law side of the court.

I note that in Richmond Screw Anchor Co. v. United States, *supra*, defendant relied on the Assignment of Claims Act, then R.S. § 3477, but the court, to avoid serious doubts as to constitutionality, construed the present § 1498 as creating an exception to the Assignment of Claims Act. It appears to me that this part of the *Richmond* case raises *a fortiori* a doubt as to the constitutionality of any supposed rule of law that forfeits a claim to just compensation on account of alleged misconduct by the claimant, not to the taker's detriment.

It may be urged, I suppose, that however equitable in origin, the doctrine of patent misuse now reflects a flaw in the legal title of a misbehaving patentee, of a kind that any eminent domain taker of any other kind of property might invoke in resisting a claim for just compensation. The answer is, I think, that the flaw is not complete and properly should go only to quantum of recovery. As against a private infringer, as the court points out, the patentee can cease his misconduct and then have equitable relief by injunction. Since such relief is not available to the § 1498 claimant because the power of Eminent Domain has been used to take it away, the "reasonable and entire compensation," if determined in light of the claimant's title flaw should also be determined in light

of the denial to him of relief available to other patentees.

This case reflects the usual division of practice in this court into watertight and sometimes ideatight compartments. Tried by patent lawyers, they put it in the, to them, familiar mold of an infringement action, though on principle it is different. It would have been interesting to have seen how lawyers with primarily eminent domain background would have handled this case. This court has in the past given effect to the defense of patent misuse in a § 1498 case and has totally forfeited the claim. Urquhart v. United States, 109 F.Supp. 409, 124 Ct.Cl. 441 (1953). It does not appear that the constitutional problem was urged or considered.

Defendant invokes the equitable doctrine of unclean hands though its long quiescence in light of its knowledge of the Cyanamid and Merck contracts, and their involvement in the New York case, hardly constitute equitable behavior on its own part, even if not an estoppel. I would assume it could now only use the alleged patent misuse as a shield when it is sued, and not as a sword in any case brought by it. This has a bearing on the extent to which plaintiff's title is in fact flawed. But for its act of Eminent Domain, defendant might not have been in a position to litigate the issue of alleged patent misuse anywhere at all.

In remanding the issues of patent misuse for trial so far as raised in paragraphs 31 and 32 of the amended answer, the court I believe should have indicated that if plaintiff did misuse its patent in those particulars, the issues of infringement and validity were not necessarily mooted, but that just compensation would have to be awarded or denied in light of all the circumstances, including the patent misuse, as well as infringement and validity.