In re YARN PROCESSING PATENT
VALIDITY LITIGATION.

SAUQUOIT FIBERS COMPANY,
Plaintiff-Appellee,

v.

LEESONA CORPORATION et al.,
Defendants-Appellants.

LEX TEX LTD., INC.,
Plaintiff-Appellant,

v.

HIALEAH KNITTING MILLS, INC., et
al., Defendants-Appellees.

LEX TEX LTD., INC.,
Plaintiff-Appellant,

v.

UNIVERSAL TEXTURED YARNS, INC.,
and G. Allen Mebane, Individually,
Defendants-Appellees.

LEX TEX LTD., INC.,
Plaintiff-Appellant,

v.

CONCORDIA MANUFACTURING CO.,
INC., and Paul O. Boghossian, Jr.,
Individually, Defendants-Appellees.

LEX TEX LTD., INC.,
Plaintiff-Appellant,

v.

BURLINGTON INDUSTRIES, INC.,
Defendant-Appellee.

LEX TEX LTD., INC.,
Plaintiff-Appellant,

v.

GOLD MILLS, INC., Defendant-Appellee.

Nos. 74–3589, 74–3695 to 74–3699.

United States Court of Appeals,
Fifth Circuit.

Nov. 5, 1976.

As Modified on Denial of Rehearing and
Rehearing En Banc Feb. 3, 1977.

Miles Kirkpatrick, Washington, D. C., for Lex Tex Ltd., Inc. and the Permatwist Co., appellants.

John J. McAleese, Jr., Plymouth Meeting, Pa., James L. Armstrong, III, and James W. Crabtree, Miami, Fla., for Lex Tex Ltd., Inc., appellant.

Frederick Rowe, Washington, D. C., Willis H. Flick and James E. Tribble, Miami, Fla., for Leesona Corp., appellant.

Richard G. Schneider, Philadelphia, Pa., William W. Beckett, Washington, D. C., for Sauquoit Fibers Co., appellee.

Gerald Kurland, Cleveland, Ohio, for Hialeah Knitting Yarns, Inc. and Bobbie Brooks, Inc., appellees.

Henry Burnett, Miami, Fla., for Serbin Fashions, Inc. and others, G. Allen Mebane, Gold Mills, Inc. and Burlington Industries, Inc., appellees.

David Klingsberg, New York City, N.Y., for Universal Textured Yarns, Inc., appellee.

David Rabin, Greensboro, N. C., for Universal Textured Yarns, Inc., Concordia Mfg. Co., Inc. and Paul O. Boghassian, Jr., appellees.

John W. Malley and William K. West, Jr., Hugh Latimer, Washington, D. C., for Burlington Industries, Inc.

Before GOLDBERG and AINSWORTH, Circuit Judges, and NICHOLS,* Associate Judge.

NICHOLS, Associate Judge:

The caption indicates the styles and docket numbers of the appeals dealt with in this opinion. They were all consolidated for argument; they are appeals taken from summary judgments entered in various patent and antitrust lawsuits which previously had been consolidated in the Southern District of Florida for the purpose of pre-trial proceedings. *In Re Yarn Processing Patent Validity Litigation,* 341 F.Supp. 376 (Jud. Pan.Mult.Lit.1972). Many of these cases have already come before us on the issue of patent validity. *See, In Re Yarn Processing Patent Validity Litigation,* 498 F.2d 271 (5th Cir.), *cert. denied,* 419 U.S. 1057, 95 S.Ct. 640, 42 L.Ed.2d 654 (1974). Approximately fifty lawsuits were originally filed. Some have been settled, some stayed pending the outcome of this appeal, and some are now before us. We dealt separately in Appeal No. 74–3703, 530 F.2d 83 (1976), as to the right of one of the counsel to participate in the cases. Treble damage claims by Leesona Corporation in Appeal No. 74–2835 was slated for separate decision but has now been settled.

After a general statement, applicable to all the cases in this group, we take up separate appeals or groups of appeals that involve common issues. No attempt will be made to bring together here all of the controlling facts involved in the cases. Further necessary facts have been set forth in conjunction with the individual appeals. The discussion in the latter parts of the opinion incorporate by reference many of the facts and issues which are discussed in previous parts, and the discussion of the several appeals should be read seriatim to make sense. The following facts are set forth simply to identify the parties and place the controlling facts discussed with the individual appeals in their proper context. The major theme which the appeals dealt with in this opinion have in common is the patent abuse doctrine under which a patentee loses the power to enforce a patent if he uses it in violation of the antitrust laws. *Morton Salt Co. v. G. S. Suppiger Co.,* 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942); *Carter-Wallace, Inc. v. United States,* 449 F.2d 1374, 196 Ct.Cl. 35 (1971).

The basic false twist process is a method for producing a synthetic yarn which is suitable for weaving cloth. It uses continuous filament fibers which have too little bulk to be woven. The false twist process causes the individual filaments to twist up upon themselves, thus creating yarn that has characteristics of softness and stretchability that are useful for many fabrics. There are different processes but they all involve the application of heat to the fibers as they are twisted over spools. The basic processes which cause the fibers to twist up to the maximum degree use one heater and they are also sometimes referred to as single heater patents. Double heater processes are methods by which the degree of twist imparted to the fibers is controlled by a second heater. The processed yarn is sometimes referred to as textured or crimped yarn. The companies which produce the textured yarn are called throwsters, a term previously used in the silk industry.

Two basement inventors, Nicholas J. Stoddard and Warren A. Seem, invented the false twist process. They had extensive experience in the fiber industry and conducted joint experiments in the mid-1930's. In 1944, a partnership known as Permatwist Company (Permatwist) was formed between the inventors and two financiers, Fred Tecce and Harold Berger. After fur-

* Of the U. S. Court of Claims, sitting by designation.

ther experimentation and development, patent applications on the basic false twist process were filed January 4, 1954. The application resulted in United States patents 2,803,105; 2,803,108; and 2,803,109. These single heater patents expired in 1974.

The single heater patent applications were sold later in 1954 to a machinery manufacturer then known as the Universal Winding Company. This Company later changed its name to Leesona Corporation (Leesona), and we will refer to it as such. Under the 1954 agreement, Permatwist assigned what were to become single heater patents to Leesona. The agreement fixed a base cost per spindle for the machinery manufactured by Leesona, at this time the Model 550 machine; the sales price per spindle was also fixed. Permatwist would receive as consideration for the assignment a spindle royalty of ½ the margin over base cost calculated on the basis of the number of spindles capable of operation on machinery sold by Leesona. Leesona was obligated under the terms of the agreement to license other machinery manufacturers under the single heater patents. Furthermore, Leesona also agreed to sell only to licensed throwsters who agreed to pay a use royalty which would be split with Permatwist.

Leesona had developed technology for improved spindles on its machinery at the time the 1954 agreement was executed. Over the next several years, patent applications were filed by Leesona. The principle United States patents issued for the spindles are the 2,791,086 issued in June 1957; and patents for two high speed spindles, the 3,044,247 issued July 17, 1962, and the 3,134,218 issued May 26, 1964. The details of the licensing program have been changed many times in subsequent modifications of the initial Leesona-Permatwist agreement, in 1958, 1960, 1965 and 1967.

The 1958 agreement was made by the same parties to reflect the installation of the Leesona high speed spindles on most of the models. These models and the fixed price per spindle for each model are more clearly identified in the 1958 agreement.

Modifications were made in the split between Permatwist and Leesona of the margin over cost. The 1960 agreement was a further modification to reflect the installation of an even more efficient high speed spindle on the Leesona Model 553 machine. The price per spindle was set for this model as well as Permatwist's share of the margin over cost. The 1960 agreement did not effect the similar terms for models manufactured under the 1958 agreement.

Each of the agreements provided a measure of price flexibility for Leesona. For example, the 1954 agreement allowed a price reduction up to 10% of the prices fixed by the agreement. Further reductions required the written consent of Permatwist. Under all the agreements, 1954, 1958 and 1960, Permatwist sold its single heater patents in exchange for both an agreed share of royalty income to be received from licensed throwsters as well as a share of the profits from the sale of machines to be sold at the fixed price.

Beginning in 1964, Leesona began to complain that it could not pay the machine royalties to Permatwist and remain competitive. Specifically, Leesona represented that it would be required by market conditions to introduce a more sophisticated Model 554 machine at the same price as the 553 machine, even though the production cost would be higher for the 554. By letter agreement dated January 21, 1964, Permatwist agreed to suspend the spindle royalty for a minimum two year period only on machines sold for use in the United States and Canada. It continued to receive a set spindle royalty on the 554 for machines sold elsewhere. No mention was made in this agreement of any price fixing terms.

A further agreement, dated December 15, 1965, extended the suspension of spindle royalties to all models developed by Lessona. However, Permatwist was to receive a 5% royalty for machines sold outside the United States, Canada, and the United Kingdom in lieu of the production royalty. The agreement recited Lessona's competitive arguments as the circumstances leading to the modifications. On June 5, 1967,

Leesona and Permatwist signed an agreement which made the waiver of spindle royalties permanent subject to later reinstitution if Leesona experienced an increase in its usual gross margin; in that event, the increase or rather excess belonged to Permatwist. The 1967 agreement also reaffirmed the existing agreements.

Throughout this period, Stoddard and Seem continued their work, and they developed double heater processes. Under the terms of the 1954 agreement, Leesona acquired the double heater patent rights which resulted in United States patents 3,091,912 and 3,077,724. However, there were competing patent applications by a French machinery manufacturer known as ARCT and others. Leesona and the French manufacturers agreed not to sue each other for infringement. The Permatwist partners wanted Leesona vigorously to press a licensing program under the double heater patents. Finally, in 1967, Lex Tex Limited (Lex Tex) a North Carolina corporation, was formed to license the Stoddard and Seem double heater patents. The stock was owned by Fred Tecce, a lawyer already mentioned as one of the Permatwist partners, and by Robert F. Conrad, a trial lawyer working for Leesona. The '912 and '724 patents were assigned to Lex Tex and Lex Tex assumed Leesona's obligation under the 1954 agreement to engage actively in a licensing program for the patents. The largest portion of the royalty income was paid to Permatwist by Lex Tex. Lex Tex subsequently acquired another double heater patent, United States patent, 3,472,011, from Ernest Scragg and Sons, Ltd., a British concern.

Under the terms of the manufacturing licenses, competing machinery manufacturers were paid a portion of the royalty income generated on the machines which had been manufactured and sold by them. As we discuss in more detail in the individual appeals, these royalty "kickbacks" constitute a minimum level of compensation that each manufacturer received for the machines it had made. We use "kickback" for want of a better term, without pejorative intent.

The history of much of this litigation is stated in the opinion of the Judicial Panel on Multidistrict Litigation, *supra,* 341 F.Supp. at 376. In general, the throwsters have repudiated the license agreements which obligated them to pay royalties, contending that the patents are invalid. They sought declaratory judgments holding that the patents are invalid and that the patents have been misused and are unenforceable. In some cases, treble damages and injunctive relief had been sought for alleged antitrust violations. Leesona and Lex Tex have counterclaimed or have filed separate lawsuits for patent infringement and breach of license agreements. After massive discovery, the throwsters filed motions for summary judgment against Leesona, Lex Tex, and the Permatwist partners. Previous motions for summary judgment were granted by the District Court Judge on the issue of patent validity but this court reversed, *supra,* 498 F.2d 271. These motions relate primarily to the antitrust and patent misuse issues although there remains a minor invalidity issue dealt with here.

The first order on the summary judgment motions was entered April 25, 1974, and a corrected order was entered July 11, 1974. In this order, Judge C. Clyde Atkins denied a motion filed by Celanese Corporation alleging that the acquisition of the Scragg '011 patent was a violation of § 7 of the Clayton Act.

In the same order, Judge Atkins granted in part a motion filed by twenty-four New York throwsters and held the single heater patents and the spindle patents unenforceable because of misuse in the hands of Leesona, the then current patent holder. The misuse was predicated on a finding that the manufacturing license agreements violated §§ 1 and 2 of the Sherman Act. Judge Atkins declined to rule that the violations caused proximate injury to the throwsters for which treble damages are recoverable under § 4 of the Clayton Act. Partial summary judgments were entered pursuant to Rules 54(b) and 56. In these judgments,

Lessona was enjoined from continuing the violations found by the trial judge. This aspect of the case is the subject of appeal by Lessona in Case No. 74–3589.

Also in this same order, Judge Atkins held the double heater patents misused both by Lex Tex and the former owner, Leesona. A motion filed by Universal Textured Yarns, another major throwster, was granted, and partial declaratory summary judgments were entered pursuant to Rules 54(b) and 56. This aspect of the case is appealed by Lex Tex in Case No. 74–3699.

In the corrected order of July 11, 1974, Judge Atkins overruled the contention of Celanese that the Leesona-Permatwist combination itself operated as a *per se* antitrust offense because of the royalty and price fixing for the machinery. However, in an order dated February 27, 1975, the Judge reconsidered the matter and granted the Celanese motion holding that the double and single heater patents had been misused. This determination had been appealed by Leesona in Case No. 75–2030 and by Lex Tex in Case No. 75–2029; however, these cases have been settled. Although all of these patents had already been declared misused under the order of July 11, 1974, we will consider the grounds stated by Judge Atkins in this subsequent order as support for the previous order.

## SAUQUOIT FIBERS COMPANY v. LEESONA CORPORATION, et al.

### Case No. 74–3589.

The subject matter of this appeal is the manufacturing licensing system set up by Leesona and Permatwist, under which machinery manufacturers other than Leesona obtained the right to manufacture machines incorporating the various patented processes. We are primarily concerned here with the relationship between the patentee, Leesona, and the machinery manufacturers and the throwsters. In the corrected order of July 11, 1974, Judge Atkins granted a summary judgment holding that the manufacturing license agreements signed by Leesona and the 14 machinery manufacturers violated §§ 1 and 2 of the Sherman Act; and, therefore, the single heater and high speed spindle patents used as an integral part of these arrangements have been misused and are unenforceable. The trial judge reserved for the trier of fact the question of whether the plaintiffs have sustained the requisite injury to maintain a treble damage action. The facts upon which the judgment is based have been compiled by the trial judge from the Local Rule 10(J)(2) statements. The following summary of the relevant facts should enable the reader to understand the issues of the case.

We pick up with the 1954 agreement between Leesona and Permatwist. Under that agreement, Leesona and Permatwist shared the royalty income which was derived from the throwsters. In 1954 the royalty was fixed by Leesona and Permatwist at 25¢ per pound.

In 1958 Leesona and Permatwist executed an agreement that required Leesona to sell its machinery only to those throwsters who executed a license providing for production royalties of 6¢ per pound. While the 1954 agreement required Leesona to refrain from preventing other machinery manufacturers from selling to licensed throwsters, the 1958 agreement provided that, in the event payments were made to other manufacturers with Permatwist's consent, Leesona would deduct these from the gross use royalties to be divided with Permatwist.

Under agreements dated April 27, 1955, and October 1, 1958, Leesona obtained patent rights from Heberlein, a competing machinery manufacturer. Heberlein received 15% of Leesona's royalty income under the 1958 agreement. Separate manufacturing license agreements were later negotiated with the machinery manufacturers. These agreements contained "most favored nations" clauses which contemplated the grant of additional manufacturing license agreements by Leesona, in substantially similar form. The manufacturing licensees were licensed free of charge to them and were to receive a 33⅓% share of the royalty

collected by Leesona on use of the machines sold by the particular manufacturer. Under the terms of the manufacturing licenses, licensees could sell the machinery only to licensed throwsters. Leesona was allowed to vary the royalty rate exacted from the licensed throwsters, but the percentage of that royalty split with the licensed machinery manufacturers remained fixed. Among machinery manufacturers, only Heberlein and Klinger, another machinery manufacturing licensee, contributed patents or technology to Leesona. The agreements transferring patent rights were independent of the manufacturing license.

The trial judge found that at least 14 manufacturing licenses were issued and that many of the manufacturers accepted the licenses only after the initiation of patent infringement litigation by Leesona. The judge assumed for the purposes of these motions that the single heater and high speed spindle patent claims were valid.

Leesona licensed between 1965 and 1969 the lion's share of the false twist texturizing industry in the United States. Its percentage share of the licensing varied between 72.1% and 80.1% during this period. Further, more than 85% of the royalties received by Leesona during this period were generated on machines manufactured by Leesona. Between 1958 and the time these law suits were initiated in 1969, the production royalties amounted to between two and six times the initial selling price of the machinery.

The throwsters challenged Leesona's practice of sharing royalties with competing machinery manufacturers on several grounds. They asserted that in the late 1950's and early 1960's alternative sources of false twist machinery became available. In order to preserve the production royalties, Leesona and Permatwist needed to insure that no throwster would be in a position to challenge the validity of the patents. Previously, Leesona had been the only source of false twist machinery. Any throwster who desired to challenge the validity of the Leesona patents was placed in

an untenable position. Without the machinery, such a throwster could not remain in the business. However, if it obtained a license, it could not, under the licensee estoppel doctrine applied before *Lear, Inc. v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), bring a challenge in court. The throwsters claimed that by the menace of alternative sources of machinery, Leesona was forced to give its competitors thus a "piece of the action" in order to maintain its grip on the industry. Using the royalty kickbacks as a carrot and the threat of expensive litigation as a stick, Leesona managed to bring its machinery manufacturing competitors into line. Leesona and Permatwist naturally contested all of this. They pointed out that under the trial judge's analysis, the patents are assumed to be valid. They explained that Leesona did not by itself have the capability to market all of the many types of machinery needed to process different varieties of textured yarn suitable for various end uses. The sharing of production royalties was necessary to insure that a sufficient number of machinery manufacturers would enter the market to fill this need, and thereby benefit the throwsters and in turn benefit the Leesona/Permatwist licensing program.

■ Resolution of these contentions would normally require a remand for trial. For example, there is nothing in the record to establish conclusively the relevant market required to prove monopolization. *United States v. E. I. duPont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). However, for the purposes of determining the existence of a *per se* antitrust violation, market analysis and questions of evil or laudatory motive are irrelevant. *United States v. Topco Assoc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *White Motor Co. v. United States*, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). The *per se* violations alleged on these facts are price and royalty fixing, illegal customer restrictions, and profit sharing.

## CUSTOMER RESTRICTIONS

■ There is no real question that under the terms of the machinery manufacturing licenses, the manufacturers were not allowed to sell to a throwster not licensed by Leesona. We fail to see how this is an illegal extension of the patent monopoly. The patents are assumed to be valid. Leesona had the right to license the use of the machinery separately from its manufacture and sale. *Extracol Process, Ltd. v. Hiram Walker & Sons*, 153 F.2d 264, 268 (7th Cir. 1946). Absent the restriction on sales to unlicensed throwsters, manufacturers who knowingly sold machinery to unlicensed throwsters would be liable for contributory infringement, 35 U.S.C. § 271 (1970); *Aro Manufacturing Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964). The throwsters placed chief reliance upon *Hensley Equipment Co. v. Esco Corp.*, 383 F.2d 252 (5th Cir. 1967); and *Ansul Co. v. Uniroyal, Inc.*, 306 F.Supp. 541 (S.D.N.Y.1969), *aff'd in part, reversed in part on other grounds*, 448 F.2d 872 (2d Cir. 1971), *cert. denied*, 404 U.S. 1018, 92 S.Ct. 680, 30 L.Ed.2d 666 (1972). However, the *per se* offense found in these cases lay in marketing restrictions imposed upon a purchaser of patented articles, limiting those to whom he might resell. It is well established that the patent monopoly ceases after the first sale of the patented article. *United States v. Univis Lens Co.*, 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942). Thus the restrictions imposed upon purchasers of the patented article were quite properly viewed as illegal extensions of the patent monopoly. But in this case, if the patents are assumed to be valid, then the restrictions on sale were within the scope of the patent grant because they were applied to a manufacturing licensee and not a purchaser of the patented articles, and because they did no more than to prevent contributory infringement by resale to unlicensed users.

## PROFIT SHARING

■ The throwsters relied upon *Citizen Publishing Co. v. United States*, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969); and *Northern Securities Co. v. United States*, 193 U.S. 197, 24 S.Ct. 436, 48 L.Ed. 679 (1904), to establish the manufacturing license agreements as a form of profit sharing. However, the crucial element which is lacking here is the predetermined division of actual profits. It is true that Leesona turned over to the manufacturers a portion of its extraordinary income. But it did not guarantee a set portion of any profit to any manufacturer. If a machinery manufacturer under a Leesona license were to incur extra expenses in producing the machines, the expense would be borne by him alone. If such a manufacturer failed to achieve an expected level of sales, the loss of revenue would not be made up. The vice inherent in the illegal arrangement in *Citizens Publishing* and *Northern Securities*, was that profits were split so that each would get the benefit of excess revenue and share the burden of expenses. The nature of this arrangement is such that it might be shown that by making such an arrangement with the machinery manufacturers, Leesona effectively removed any incentive for the development of alternative technology, or market for such if developed. *Cf., Hartford Empire Co. v. United States*, 323 U.S. 386, 396, 65 S.Ct. 373, 89 L.Ed. 322 (1954). But this would require a trial on the merits. We cannot speculate on this scanty summary judgment record that does not even educate us as to the existence of alternative technologies. However unreasonable this arrangement might otherwise be, it does not come within the purview of the *per se* profit sharing offense.

## PRICE FIXING

■ Normally, a patentee may license other parties to manufacture products incorporating his invention and fix the price at which the products are sold by the licensee. *United States v. General Electric Co.*, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926). However, the privilege is unavailable where two or more patentees fix the prices of products incorporating several independently owned patents. *United States v. Line Material*, 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701 (1947). The question now be-

comes whether the undisputed facts reveal an identifiable form of price fixing.

Even if it is assumed, as it must be for the purposes of summary judgment, that the purpose of the royalty payments to the machine manufacturers was to make entry into the machinery industry more attractive, it is apparent that this was achieved by guaranteeing a level of compensation. Lessona said to each manufacturer that it would receive one third of the royalties collected from each throwster using the machines of that manufacturer. It could hope that with normal use, a machine would generate a share of royalties for it, much exceeding the sales price. By acting as a conduit of the royalties between the throwsters and the machinery manufacturers, Leesona insured that there could be no negotiation between the throwsters and machinery manufacturers concerning this major portion of the compensation received by the manufacturers for the machinery. Thus, by means of the royalty sharing arrangement between Leesona and the machinery manufacturers, the price of the machinery which the throwsters would have to pay was fixed. This is clear since although the throwsters actually paid the royalties to Leesona, these payments were the direct source of the compensation paid to the machinery manufacturers. Leesona was the party that gave up a portion of royalty income to its competitors, but this does not obviate the nature of these payments as compensation to the manufacturers which Leesona forced the throwsters to pay. A patentee may usually exact whatever royalty it wishes. But, Leesona and Permatwist elected to take a one third reduction in their royalty income. There is nothing in the patent laws that allows them to decide unilaterally that the machine manufacturers would get the entire benefit of their own royalty reduction. By allocating this benefit, Leesona guaranteed income to the manufacturers and effectively fixed the price of the machinery. The machinery manufacturers who participated in the scheme were protected against free competition and free bargaining in effecting their sales to throwsters.

 With the "most favored nations clause" Leesona and its machinery manufacturing competitors entered into a combination under which everyone could expect that as far as the royalty kickbacks were concerned, the rate of compensation to each manufacturer would be identical. The fact that Leesona set the level of this compensation unilaterally for itself and for its competitors and that each competitor became a party independent of the others does not alter the nature of this arrangement as one fixing prices. *United States v. Masonite Corp.*, 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1778 (1942); *United States v. Gypsum Co.*, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948); *United States v. Line Material*, 333 U.S. 287, 294 n. 8, 68 S.Ct. 550, 92 L.Ed. 701 (1948).

 Theoretically, manufacturers compete on the initial sales price paid by the throwsters for the machines themselves. But the sales price of the machinery consisted of two elements: the initial price of the machine and the royalty payments. Thus, an individual manufacturer might decide to grant a price concession on the initial sale of the machine which would balance any excess royalties required by Leesona. However, it has been uniformly held that competition on one or more terms of a contract does not obviate a combination among competitors to fix a different term. In *Plymouth Dealers' Assoc. of Northern California v. United States*, 279 F.2d 128 (9th Cir. 1960), it was held that fixing the asking price among automobile dealers was *per se* price fixing even though they were individually free to grant larger discounts or trade-in allowances (at 132):

> * * * When the term "fix prices" is used, that term is used in its larger sense. A combination or conspiracy formed for the purpose and with the effect of raising, depressing, fixing, pegging or stabilizing the price of a commodity in interstate commerce is unreasonable *per se* under the Sherman Act. * * * The test is not what the actual effect is on prices, but whether such agreements interfere with "the freedom of traders and thereby restrain their ability to sell in

accordance with their own judgment." * * * The competition between the Plymouth dealers and the fact that the dealers used the fixed uniform list price in most instances only as a starting point, is of no consequence. It *was* an agreed starting point; it had been agreed upon between competitors; it was in some instances in the record respected and followed; it had to do with, and had its effect upon, prices.

The fact that there existed competition of other kinds between the various Plymouth dealers, or that they cut prices in bidding against each other, is irrelevant. * * * (Emphasis supplied to word *was*. Footnote 6 not cited.)

Any reduction or limitation of price competition brings a combination within the *per se* violation despite the existence of alternative channels where competition might occur. *United States v. Container Corp.*, 393 U.S. 333, 337, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969). Interference with the setting of price by free market forces alone is sufficient. There is no requirement under § 1 of the Sherman Act that all avenues of competition be eliminated, or that the price fixing effectuate its purpose. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n. 59, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). *See,* also, *Stavrides v. Mellon Nat'l Bank & Trust Co.*, 353 F.Supp. 1072, at 1075 (W.D. Pa.1973); *Mid America ICEE, Inc. v. John E. Mitchell Co.*, 1973 CCH Trade Cases, ¶ 74,681 (D.Ore.1973).

Leesona contended that to hold the manufacturing licenses illegal because the fixed royalty rate is an important part of the compensation paid by the throwsters would require a holding that any manufacturing license is illegal as soon as the total royalties collected by the patentee become an important component of price. However, our holding is more limited. First, it only applies in the limited circumstances arising from a combination of patents, *cf., General Electric, supra.* Second, it only applies where the patentee fixes royalty payments to a party who is not a patentee. *Standard Oil v. United States*, 283 U.S. 163, 51 S.Ct. 421, 75 L.Ed.2d 926 (1931), allows patent holders to combine their technology in a patent pool and to charge a royalty fixed among the patent holders themselves where this conduct is otherwise reasonable. Such a course of action is necessary to cooperatively license the combined patents. *Standard Oil* does not extend to arrangements made with non-patentee competitors to fix royalties charged by the patentee or to allow the patentee to turn over to competitors a fixed compensation collected from customers of the competitors under the guise of sharing royalty income.

*Per se* patent abuse is here established and no showing is made that this abuse has been terminated.

AFFIRMED.

## TREBLE DAMAGES

As noted earlier in its April 25, 1974 order, the District Court decided that the manufacturing license agreements signed by Leesona and the fourteen machinery manufacturers violated the Sherman Act, 15 U.S.C. §§ 1 and 2; and that the single heater and high speed Hilbert spindle patents, owned by Leesona and used as an integral part of these arrangements, have been misused and are therefore unenforceable. The District Court refused to grant the throwsters' summary judgment motion that these antitrust violations proximately caused injury to the throwsters for which treble damages under § 4 of the Clayton Act, 15 U.S.C. § 15, are recoverable. The court explained:

The facts as agreed to, however, do not establish as a matter of law at this point the proximate cause of any damages sustained by the throwsters nor their amount. The trier of fact must determine whether the throwsters will prevail * * * as to these counterclaims.

Leesona has appealed to this court, urging the facts presented to the District Court mandate a finding that, not only the denial of the throwsters' motion for summary judgment was proper, but that the throwsters did not suffer any legal injury and that their claims are barred by the

statute of limitations relating to Clayton Act claims. In support of these positions, Leesona has set forth a number of specific arguments. We, however, find it unnecessary to consider these contentions Leesona has raised with respect to lack of legal injury to the throwsters and the possible application of the statute of limitations. This portion of the District Court's order is interlocutory in nature, non-appealable, and thus not properly before this court.

The District Court entered final judgment only as to violations by Leesona of §§ 1 and 2 of the Sherman Act; the court specifically reserved for trial the issue of Leesona's civil liability for damages under the Clayton Act. It is only with respect to the throwsters' Clayton Act claims that the issues of legal injury and application of the statute of limitations are relevant.

■ Leesona, citing 28 U.S.C. § 1292(a)(1), has attempted to breathe finality into the District Court's reservation of these issues for trial via the injunction which was issued in the final judgment of May 25, 1974 (which implemented the relevant portions of the April 25, 1974 order); but, the injunction was addressed only to the cessation of those activities which gave rise to violations of §§ 1 and 2 of the Sherman Act:

> § 1. *Trusts, etc., in restraint of trade illegal; exception of resale price agreements; penalty*
>
> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: *Provided*, That nothing contained in sections 1 to 7 of this title shall render illegal, contracts or agreements prescribing minimum prices for the resale of a commodity which bears, or the label or container of which bears, the trademark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts or agreements of that description are lawful as applied to intrastate transactions, under any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such resale, and the making of such contracts or agreements shall not be an unfair method of competition under section 45 of this title: *Provided further*, That the preceding proviso shall not make lawful any contract or agreement, providing for the establishment or maintenance of minimum resale prices on any commodity herein involved, between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other. Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1 to 7 of this title to be illegal shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.
>
> July 2, 1890, c. 647, § 1, 26 Stat. 209; Aug. 17, 1937, c. 690, Title VIII, 50 Stat. 693; July 7, 1955, c. 281, 69 Stat. 282.
>
> § 2. *Monopolizing trade a misdemeanor; penalty*
>
> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.
>
> July 2, 1890, c. 647, § 2, 26 Stat. 209; July 7, 1955, c. 281, 69 Stat. 282.

These sections of the Act deal with criminal liability; the injunction which was issued

ordered the termination of violations of a criminal statute of the United States. This injunction is in no way related jurisdictionally to potential civil liability under the Clayton Act and in no way presumes that a showing of the kind of legal injury to succeed under § 4 of the Clayton Act has been made.

[Editor's Note: The material deleted by Order on Motion for correcting Opinion, infra p. 1144, has been omitted.]

REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

LEX TEX LTD, INC. v. HIALEAH KNITTING MILLS, INC., et al.

Case No. 74–3695

LEX TEX LTD, INC. v. UNIVERSAL TEXTURED YARNS, INC., et al.

Case No. 74–3696

LEX TEX LTD, INC. v. CONCORDIA MANUFACTURING CO., INC., and PAUL O. BOGHOSSIAN, JR.

Case No. 74–3697

LEX TEX LTD, INC. v. GOLD MILLS, INC.

Case No. 74–3699

PATENT MISUSE

In the corrected order filed July 11, 1974, the District Court granted a motion for summary judgment filed by Universal Textured Yarns (UTY), a New York throwster, declaring the double heater patents now owned by Lex Tex unenforceable. Partial summary judgments were granted under Rule 54(b) of the Federal Rules of Civil Procedure to other throwsters on the basis of the UTY motion. In the original motion and supplements thereto, UTY submitted statements under Local Rule 10(J)(2) asserting a total of 26 material facts it considered undisputed. Lex Tex has contested below and continues to contest most of these facts. However, it has not responded with affidavits or other evidence appropriate under Rule 56 of the Federal Rules of Civil Procedure. The trial judge rejected as

"perfunctory" the denials raised by Lex Tex in its Rule 10(J)(2) statement to the material facts asserted by UTY. The order does not clarify which of the denied facts are supported by the evidentiary material submitted with the UTY motions and which of the denied facts are considered dispensable to establish UTY's entitlement to judgment as a matter of law. Many of the UTY proposed facts submitted under its Local Rule 10(J)(2) statement of material facts to which there is no material dispute relate to allegedly illegal customer restrictions, profit pooling, alleged use of licenses to insulate patents from validity contests, and a pattern of monopolization with Leesona. We have considered similar contentions against Leesona in Case No. 74–3589, where the material facts found by the trial judge were undisputed on the appeals. The legal arguments advanced by the throwsters to support these contentions are no more persuasive than the contentions raised against Leesona. We have, therefore, deemed the facts advanced by UTY to support these contentions immaterial.

The throwsters have also alleged that more recently issued Lex Tex licenses contain an allegedly illegal royalty escalation provision under which royalties for the double heater patents increased upon the expiration of Leesona's single heater patents in 1974. The new license agreements are included in the record; and they show that, upon the expiration of the single heater patents, the royalty for the double heater patents is calculated on a percentage of the price paid for the raw fibers. Before the expiration of the single heater patents, royalties had been calculated on the basis of the number of pounds produced without regard to the price paid for the fiber. Although some data has been presented showing that for certain sizes of yarn fiber and for fibers produced by certain manufacturers, the royalties would tend to increase after the expiration of the single heater patents, we cannot on summary judgment draw an inference adverse to Lex Tex to the effect that there has been an overall increase in royalties. In any

event, the *per se* offense of charging use royalties following the expiration of the patents is governed by the leading Supreme Court case of *Brulotte v. Thys Co.*, 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964). In that case the collection of use royalties was deemed illegal only after the expiration of the last patent. Here the royalties are collected under unexpired double heater patents. Normally, a patent holder may charge whatever it likes for a license. *American Photocopy Equipment Co. v. Rovico, Inc.*, 257 F.Supp. 192, 199–200 (N.D.Ill. 1966), *affirmed*, 384 F.2d 813 (7th Cir. 1967), *cert. denied*, 390 U.S. 945, 88 S.Ct. 1030, 19 L.Ed.2d 1133 (1968). The throwsters' allegations of patent royalty escalation do not reveal on their face any misuse of the patents, and the related facts submitted by UTY are deemed immaterial.

The Lex Tex post-treating patents cover processes designed to control the degree of bulk of the yarn which is produced under the false twist or single heater process. These post-treating processes are sometimes referred to as double heater processes, and we view the terms as interchangeable. The textured yarn produced by the single heater process is composed of filaments which are twisted up on themselves. These yarns are very bulky. If the yarn is pulled, the filaments will tend to straighten. However, they have a latent torque, and they will quickly retract to their highly twisted state if the yarn is released. By subjecting the fibers to a second heating process while the yarn fibers are fully or partially extended, the throwsters can set the degree to which the yarn fibers will twist up on themselves when the tension is released. The yarns produced at different settings will be woven into cloth which will have different characteristics of stretchability and feel depending upon the tension applied to yarn when it is set by the second heater.

Two of the post-treating patents, the '724 and '912 patents, originated with Nicholas J. Stoddard and Warren A. Seem, two of the Permatwist partners. These patents were transferred to Leesona under the 1954 agreement between Leesona and Permatwist. In 1957, Leesona began to sell its Model 511 post-treating machine under royalty-free licenses. However, users were obligated to use the machine only with torque-stretch (false twist) yarns. And in 1965 Leesona and Permatwist agreed to sell the machines only to purchasers who signed royalty bearing use licenses.

Under the 1954 agreement, Leesona was obligated to license thermal processing. However, in late 1967 Lex Tex North Carolina assumed Leesona's obligations to license the post-treating patents diligently. Leesona shortly thereafter assigned the post-treating patents to Lex Tex North Carolina. Lex Tex North Carolina agreed to license Leesona to manufacture machines under these patents and it also agreed to pay to Leesona 25% of the royalties generated by the use of machines manufactured by Leesona. Under the agreements, Lex Tex also was required to pay the largest share of the royalty income to Permatwist.

Subsequently, Lex Tex licensed other machinery manufacturers to manufacture machinery utilizing the post-treating process. These manufacturers were entitled under the license agreements to a 25% share of the royalty income generated by the use of the machines manufactured by each manufacturer.

Lex Tex Florida was formed under the ownership of Permatwist's general counsel and Leesona's trial counsel. In 1970, Lex Tex North Carolina and Permatwist re-assigned the Stoddard post-treating patents to Lex Tex Florida. Permatwist retained the right to the bulk of the use royalties. Lex Tex Florida acquired from Ernest Scragg & Sons, Ltd., a British concern, United States patent 3,472,011 covering post-treating. Lex Tex Florida has issued licenses under all three of its post-treating patents.

It is readily apparent that Lex Tex fixes prices for post-treating machinery in the same manner that Leesona fixes prices of single heater machinery. Here, as in the Leesona manufacturing license agreements, the machinery manufacturers are guaranteed under the license agreements that portion of the compensation for the machinery or servicing which is reflected in the royalty

kickback. The post-treating process can be implemented as an additional step on the same false twist machinery used to throw the textured yarn, or it may be implemented on a second machine which is fed spools of processed yarn from a single heater machine. Thus, on the machines which implement both processes, the machinery manufacturers would receive a fixed production royalty compensation through Lex Tex which would be in addition to the fixed royalty compensation received through Leesona. In this manner, the Lex Tex royalty kickbacks to the machine manufacturers serve to fix the minimum price they receive for their machinery at a higher level.

The question of whether the arrangements involving Lex Tex come within the price fixing prohibition of the *Line Material* case presents a more difficult issue of law. In the Leesona appeals and the *Line Material* case itself, the payments which were shared among the patent holders were clearly identified as royalty income which was split in a fashion to reward patent holders for their technological contribution.** In this case the causal connection is somewhat less clear. Although Leesona is a patent holder in the same patent field as Lex Tex and Permatwist, it is receiving the same level of royalty kickback as other machinery manufacturers who take licenses from Lex Tex. Its royalty share is calculated solely upon the use of the machines it manufactures and it never received anything directly from Lex Tex in relation to machinery manufactured by other manufacturers. The fact that its level of compensation in the form of a royalty kickback is the same as the other machinery manufacturers who have contributed lends support to an inference that this compensation has nothing to do with Leesona's position as a patent holder. If this is so, we may not have the combination of two patent holders

to fix prices, that we condemned as to Leesona in Case No. 74–3589.

However, it appears from the broad language used in the majority opinion in the *Line Material* case that the court did not view such a causal connection as a required element of the offense. It is only necessary that benefits arising from any one or more patents be shared among patentees in the same patent field to establish the price fixing prohibition. *United States v. Line Material, supra*, 333 U.S. at 315, 68 S.Ct. 550.

Some historical perspective is necessary properly to interpret the *Line Material* case. The Government presented the case on the theory that *United States v. General Electric Co.*, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926) should have been overruled. In *General Electric*, the Court had ruled that a patent holder could properly set a sales price at which a manufacturing licensee could sell the licensed product. Of the eight Justices sitting on the *Line Material* case, four accepted the Government's position and wanted to reverse *General Electric*, see 333 U.S. 135, 47 S.Ct. 192, 71 L.Ed. 362 (Douglas, J., concurring). Three Justices viewed *General Electric* as controlling and wanted to follow it, 333 U.S. at 321, 47 S.Ct. 192 (Burton, J., dissenting). Justice Reed in the majority opinion emphasized that the rule of *General Electric* had been relied upon by the business community and that any change in the rule should be accomplished by Congress, 333 U.S. at 303, 47 S.Ct. 192. However, he saw a distinction from *General Electric* in that competition is restricted to a greater degree where two or more patent holders fix prices than where one patent holder does so even though there was little potential for competition between the blocking patents involved in the *Line Material* case. The rationale for the distinction was that the potential for the de-

---

** Lex Tex also shared royalty income with Scragg, the source of the '011 patent. The royalty income was clearly identified as such, and Scragg's share was calculated on the basis of the use royalties generated on all the double heater machinery licensed by Lex Tex. How-

ever, this did not begin until 1971. We need to examine the sharing of royalty income between Lex Tex, Leesona, and Permatwist in order to establish misuse occurring before this date which would affect potential liability for infringement or breach of license agreements.

velopment of competitive alternative technology is restricted by the cooperative exploitation of patents in combination with fixing sale prices, 333 U.S. at 311, 47 S.Ct. 192.

██ This rationale applies in equal, if not greater, measure where non-patent holder competitors are also allowed to share the benefits of the patent. Such an arrangement goes beyond the evils of *Line Material* because the non-patentee machinery manufacturers are left with less incentive to patronize alternative technology as well as the reduced incentive to do so on the part of the patent holders. The finding of misuse on the part of Lex Tex is affirmed.

AFFIRMED.

## LEX TEX LTD, INC. v. BURLINGTON INDUSTRIES, INC.,

Case No. 74–3698

Among the infringement and license breach cases dismissed on August 29, 1974, Judge Atkins dismissed a Lex Tex complaint against Burlington. The basis of the dismissal was the determination that the "patents on which the case is premised" are unenforceable. Although the complaint is certainly not very lucid, we believe that it does state an antitrust case against Burlington of the same nature as the group boycott claim asserted by Leesona against Celanese/FII which were not involved in *Celanese Corp. v. Leesona Corp.*, Case No. 74–2835, as the trial court had not ruled on them.

Burlington relied upon *Consolidated Packaging Machinery Corp. v. Kelly*, 253 F.2d 49, 51 (7th Cir.), *cert. denied*, 357 U.S. 906, 78 S.Ct. 1151, 2 L.Ed.2d 1156 (1958); and *Massillon-Cleveland-Akron Sign Co. v. Golden State Advertising Co.*, 444 F.2d 425 (9th Cir.), *cert. denied*, 404 U.S. 873, 92 S.Ct. 100, 30 L.Ed.2d 117 (1971), for the proposition that an enforceable patent is a prerequisite to the maintenance of a suit for inducing breach of a license.

·As far as standing to bring the antitrust claim is concerned, Lex Tex is here much more the target of the alleged violations than was alleged in the now settled *Cela-*

*nese Corp. v. Leesona Corp.*, Case No. 74–2835. In that case the patentee claimed it was injured as an incidental party when the defendant's activities allegedly injured the industry as a whole. Here, Lex Tex has alleged that the nature of the antitrust violation was directed at itself.

Count III of the complaint seeks a declaratory judgment that Lex Tex has not violated the antitrust laws. This portion of the complaint has been properly dismissed in light of the other decisions holding that Lex Tex has misused the patents by committing the *per se* offense of price-fixing.

██ As regards the other counts, if the holding of unenforceability of the Lex Tex patents stands, it is difficult to see in what manner Lex Tex could prevail. The record indicates that, for practical purposes, it is nothing except for its patents. On the premise it has abused them, it is not apparent what other rights it can enforce by the counts other then III. In *Consolidated Packaging Machinery Corp.* as here, the unenforceability was due to an antitrust violation. In effect, it is not coming into court with clean hands. If it has a claim not premised on the unenforceable patents, it can amend. The case of *Leesona*, No. 74–2835, was different insofar as it had broad non-patent business interests, and we express no opinion concerning the counts of its complaint, not involved in its appeal.

AFFIRMED.

## LEX TEX LTD, INC. v. HIALEAH KNITTING MILLS, INC.

and

## LEX TEX LTD, INC. v. BOBBIE BROOKS, INC.

Case No. 74–3695

## LEX TEX LTD, INC. v. BURLINGTON INDUSTRIES, INC.

Case No. 74–3698

### INVALIDITY OF THE YARN PRODUCT CLAIMS OF PATENT 3,091,912

██ ██ By order of May 3, 1974, granting partial summary judgment under Rule 56(c), Fed.R.Civ.P. implemented in the final

judgment of September 3, 1974, under Rule 54(b), Fed.R.Civ.P. the District Court held invalid all the yarn product claims of patent. 3,091,912 (the '912 patent). These claims, specifically 24 through 28 and 31 of the patent, were held to be not new within the meaning of 35 U.S.C. § 101 and hence overbroad and invalid under 35 U.S.C. §§ 102 and 282. Other claims under the patent, i. e., those relating to the device itself and the production of these yarns, were not affected by this judgment. While other grounds for a finding of invalidity of the '912 patent were stated in the May 3, 1974 order, the final judgment of invalidity under Rule 54(b) was granted only as to the yarn product claims. We find these claims to be severable and thus properly here on appeal. *Timely Products Corp. v. Arron,* 523 F.2d 288 (2d Cir. 1975). We also find the District Court acted within its proper discretion in retaining jurisdiction over those matters to which final judgment was not granted. *Sears Roebuck & Co. v. Mackey,* 351 U.S. 427, 76 S.Ct. 895, 100 L.Ed. 1297 (1956); *Cold Metal Process Co. v. United Engineering & Foundry Co.,* 351 U.S. 445, 76 S.Ct. 904, 100 L.Ed. 1311 (1956).

In granting the summary judgment motion, the District Court accepted the appellees' interpretation of an answer to an interrogatory propounded by appellee Celanese to Mr. Warren Seem, a Permatwist partner, inventor of the technology covered by the '912 patent, and a party to this litigation. The District Court construed Mr. Seem's response as an admission that the yarn product claims in the '912 patent included claims to yarns which were present in fabrics produced by the common practice of the art prior to the '912 patent. The District Court held that inasmuch as these yarn product claims in the patent defined matter in the public domain at the time application was filed for the patent, the claims therein are invalid for being overbroad. The interrogatory and answer which are the foundation for the District Court's decision are as follows:

*Interrogatory 67.*

Patent 3,091,912 states: "After 'textured yarns' in general and 'torque stretch yarns' in particular are fabricated, it is common practice to use various finishing techniques to obtain desirable fabric characteristics" (Col. 1, 11. 49–52

With respect to the quoted statement:

(a) Please identify and describe the methods of fabrication which are contemplated by the word "fabricated".

[Seem's Answer:]

Fabricated requires that a yarn be made into a new and useful form and includes knitting and weaving a yarn into fabric.

\* \* \* \* \* \*

(d) Please state whether or not the yarns comprising fabrics subjected to any of the "various finishing techniques" respond to the yarn definitions which are set forth in any of claims 24, 25, 26, 27, 28 and 31 [the yarn product claims] of patent 3,091,912.

[Seem's Answer:] Yes.

(e) If your answer to Interrogatory 67(d) is 'yes' as to any of claims 24, 25, 26, 27, 28 and 31, please state in detail how it was determined that the yarns in question respond to the claim definitions.

[Seem's Answer:]

The 'yarns in question' inherently possessed the active and/or latent characteristics which upon utilization of precise fabric finishing process produced desirable and results.

Appellees contend that this interchange resulted in an unambiguous admission that the common practice, i. e., what was old, at the time the application for patent '912 was filed included the application of various finishing techniques to knitted and woven fabrics made from torque-stretch yarns and that yarns in fabrics subjected to any of the various common finishing techniques respond to the yarn definitions which are set forth in claims 24 through 28 and 31 of the patent, i. e., display the same characteristics of yarn described in these claims.

Lex Tex urges that the answer is subject to other interpretations favorable to Lex Tex which the District Court was obliged to consider on a summary judgment motion. Lex Tex argues that Mr. Seem's answer

contemplated that the "yarns" referred to in the interrogatory were yarns processed by the '912 patent invention, and that the answer really states that these yarns retain the characteristics the subject of the yarn product claims in the patent and imparted by the invention covered by the patent even after being subjected to the various common finishing techniques. Thus, the '912 process gives to the yarn treated by this invention certain inherent qualities before finishing occurs; and hence the answer is then an affirmation of the '912 claims and does not admit that the claims set forth in the patent were obtainable by means of the finishing techniques in common use.

■■■ Given this plausible interpretation of the questions and answers, and the general nature of the response, including the lack of specificity as to which or all of the yarn product claims the answer refers, the District Court's judgment must be reversed. We find that the interrogatory and answer are sufficiently ambiguous to brook other reasonable interpretations which the District Court erroneously refused to draw in Lex Tex's favor.

■■■ Appellees Hialeah Knitting Mills, Inc. and Bobbie Brooks, Inc., have advanced in this appeal a second ground, one not utilized by the District Court, to support the finding of invalidity of the '912 patent. The disclosure provided in the patent is attacked as inadequate in that the yarn product claims listed in the patent are inherently defective since these claims, relating to improvements in existing devices, may not use "conveniently functional language at the exact point of novelty", citing *General Electric v. Wabash Co.*, 304 U.S. 364, 371, 58 S.Ct. 899, 903, 82 L.Ed. 1402 (1938); and *Bryan v. Sid Richardson, Inc.*, 254 F.2d 191 (5th Cir. 1958), thus leaving unclear the coverage of the patent. Without reference to additional factual information, now lacking in the record, we do not find the language used in the yarn product claims so overbroad on its face to invalidate this patent.

REVERSED AND REMANDED.

ON PETITIONS FOR REHEARING AND PETITIONS FOR REHEARING EN BANC and ON MOTION FOR CORRECTION OF OPINION BY SAUQUOIT FIBERS COMPANY

PER CURIAM.

The Petitions for Rehearing on behalf of LEESONA, PERMATWIST and LEX TEX are DENIED and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petitions for Rehearing En Banc are DENIED.

The Motion for Correction of Opinion by SAUQUOIT FIBERS COMPANY is GRANTED as follows:

From Slip Op. of Nov. 5, 1976, p. 6477, 541 F.2d 1139, delete everything in left column after the first three lines. Insert:

REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

The issues dealt with in the deleted two paragraphs had been settled before the date of oral argument. The Court regrets the error. We had considerable difficulty keeping straight what was settled and what was not, and particularly so with further settlements made and announced to the Court after briefing and oral argument were complete. We have attempted not to adjudicate any settled issue, although this necessitated restructuring the opinion after it was virtually complete. We are advised that Appeal No. 75–2030 has not been settled with respect to *Sauquoit* v. *Leesona* issues. (Cf. Slip Op., p. 6470, left column, lines 6–10, 541 F.2d 1133.) The parties advise that they anticipate settlement. They are directed to take necessary steps if they settle, to get the case off our docket of record. If they do not settle, it still is not apparent how or why further consideration by us is necessary, and we will dispose of the appeal *sua sponte* if the parties do not promptly advise why we should not do so, and what we should do instead.